```
 1                UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Springfield)

 3                        No. 3:18-cr-30001-WGY

 4

 5

 6   UNITED STATES OF AMERICA

 7

 8   vs.

 9

10   NIA MOORE-BUSH and DAPHNE MOORE

11

12                        * * * * * * * * *

13

14                     For Hearing Before:
                       Judge William G. Young
15

16              Motion to Suppress/Final Pretrial

17

18                     United States District Court
                       District of Massachusetts (Springfield)
19                     300 State Street
                       Springfield, Massachusetts 01105
20                     Monday, May 13, 2019

21                        * * * * * * * *

22

23              REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
24                United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
25                     bulldog@richromanow.com
```

```
 1                    A P P E A R A N C E S

 2

 3    KATHARINE WAGNER, ESQ.
          United States Attorney's Office
 4        300 State Street, Suite 230
          Springfield, Massachusetts 01105
 5        (413) 785-0111
          Email: Katharine.wagner@usdoj.gov
 6   and
       AMY H. BURKHART, ESQ.
 7        United States Attorney's Office
          1 Courthouse Way, Suite 9200
 8        Boston, Massachusetts 02210
          (617) 748-3100
 9        Email: Amy.burkart@usdoj.gov
          For the United States
10

11    THOMAS J. O'CONNOR, JR., ESQ.
          O'Connor Martinelli
12        1391 Main Street, Suite 1022
          Springfield, Massachusetts 01103-1649
13        (413) 781-5311
          Email: Attorneytomoconnor@gmail.com
14        For defendant Nia Moore-Bush

15
      LINDA J. THOMPSON, ESQ.
16        Thompson & Thompson
          1331 Main Street
17        Springfield, Massachusetts 01103
          (413) 739-2100
18        Email: Linda@ttpclaw.com
          For defendant Daphne Moore
19

20

21

22

23

24

25
```

1            P R O C E E D I N G S

2            (Begins, 2:00 p.m.)

3            THE COURT:  Good afternoon.  Would counsel

4    identify themselves.

5            MS. WAGNER:  Good afternoon, your Honor,

6    Katharine Wagner on behalf of the United States.

7            MS. BURKART:  Good afternoon, your Honor, Amy

8    Burkart for the United States.

9            MS. THOMPSON:  Good afternoon, Judge Young,

10   Attorney Linda Thompson for Daphne Moore.

11           MR. O'CONNOR:  And good afternoon, your Honor,

12   my name's Tom O'Connor and I'm here on behalf of

13   Ms. Moore-Bush.

14           THE COURT:  Good afternoon.

15       The Court has before it, and you may correct me

16   once we've worked through these, really four separate

17   matters, two of them may be dealt with summarily and two

18   are quite substantive indeed.

19       The first is the motion, um, for a bill of

20   particulars.  No adequate showing has been made to

21   warrant the issuance of a bill of particulars and that

22   motion is denied without hearing, with one exception.  I

23   want to know, from the government, who the government

24   contends are the co-conspirators, charged or uncharged,

25   in the drug conspiracy and in the money-laundering

1  conspiracy?  Those are the two overlapping conspiracies

2  alleged here, isn't that right?

3           MS. WAGNER:  That's correct, your Honor.  And

4  the government actually filed a letter under seal

5  earlier in the case, around the time we did automatic

6  discovery, that was sent to defendants that listed

7  the indicted and -- well, unindicted co-conspirators in

8  that -- in those two counts.  So I think that that's on

9  the record.  I'd be happy to have my assistant go down

10  and grab a copy of that if you'd like.  But we have put

11  it on the record.

12           THE COURT:  Actually I would like, because I

13  haven't focused on it, and for, um, the necessity of

14  **Petruzziello** and **Campaglia** rulings, I'd like to know how

15  we're going to start here.

16       You should understand that, um, I take the

17  evidentiary rulings in a conspiracy case very seriously

18  and if I have admitted in evidence, um, communications

19  from a person who -- and this is a finding by the judge,

20  not -- it's not a directed verdict, who at the close of

21  the government's case I don't find, by a fair

22  preponderance of the evidence, is a co-conspirator, I

23  must strike that evidence out.

24       Now if that's any more than completely peripheral,

25  it becomes a very serious matter indeed because my

1   experience has been that you do not unring the bell with

2   a jury.  I make those statements not critical of anyone,

3   just that you must be very careful when introducing

4   co-conspirator hearsay, because I try to police that in

5   a fair and careful manner.

6        All right.  So that's the order on the bill of

7   particulars.

8        Then there's more than one motion, but motions

9   directed to wiretap evidence, do I understand from the

10  government that the government does intend to use

11  wiretap evidence in this case?

12            MS. WAGNER:  We do, your Honor.

13            THE COURT:  Against both defendants?

14            MS. WAGNER:  Yes, your Honor.

15            THE COURT:  All right.  Those motions are

16  denied.

17       What gives rise to these motions, I have to say,

18  is an unfortunate predilection about which I have

19  already complained to the United States Attorney and

20  indeed all his predecessors, since they've been asking

21  us for our views of law enforcement agents, that when

22  they seek a wiretap, to list every possible name

23  including -- and I don't say in this case, but I can

24  remember cases where they're listing people "last name

25  unknown," "first name unknown," and then they're seeking

1    to have a judicial determination as probable cause to

2    believe that that person's committing a crime.  That is

3    an extremely unfortunate approach on the part of law

4    enforcement.

5        When a wiretap is sought, what should be done is

6    to list only the individuals in good faith whom the

7    Assistant United States Attorney -- this shouldn't be

8    surrendered to the law enforcement agencies, who the

9    Assistant United States Attorney believes there is

10   probable cause to believe that are committing the, um,

11   crimes which would give rise to permission for a

12   wiretap.

13       Indeed having read these motions -- I was not the

14   issuing magistrate, it was Judge Mastroianni, but his

15   practice is identical to mine, and I reviewed my own

16   practices and I will tell you that in the last four

17   years there have been only two wiretaps that I've issued

18   without modification, all because the government

19   always -- not always, in two instances they did not, but

20   in every other instance where I've issued a wiretap I've

21   narrowed it because they've asked for a judicial finding

22   that there is then probable cause to believe that the

23   person is committing the crimes that give rise to the

24   wiretap.  I don't do it and I see, in this case, that

25   Judge Mastroianni didn't do it.

1        Now having said all that, and it needs to be said,

2   it makes no difference here because he -- the warrant is

3   amply supported for the wiretap that was issued, and

4   once the wiretap is issued, the conduct of the officers

5   here is, um, in my judgment under the controlling cases,

6   is, um, not to be -- well it can be impugned, but it's

7   perfectly appropriate here because of course the wiretap

8   is a discovery device and what was discovered on the

9   wiretap leads to further inquiry and the like.  So the

10  motion's denied -- those motions are denied.

11       Now that leaves us to the two motions that are of

12  major significance here.  And the first motion that I

13  want to entertain and I'm eager for argument on is the

14  motion having to do with the statements by Nia Moore-

15  Bush.  And so let me ask again, because we need to

16  narrow what we're dealing with here.

17       Do you seek to introduce those statements in the

18  trial?

19            MS. WAGNER:  We would, your Honor.

20            THE COURT:  And I take it that none of those

21  statements are admissible against, um, Daphne Moore?

22            MS. WAGNER:  That's correct, your Honor, and

23  we would fashion them in such a way that they wouldn't

24  run into any **Bruton** issues.

25            THE COURT:  You're anticipating me and I

1    appreciate it.  That means -- having dealt with *Bruton*

2    issues in the past, there will obviously be no reference

3    to her, Daphne Moore, nor will there be any reference to

4    Jane Doe or some substitute for her, nor will there be

5    any reasonable innuendo that a third -- well, Moore-Bush

6    speaks of other people, but -- and other people, a

7    number of whom are alleged co-conspirators.  But I will

8    be very careful that there be no reference, even by

9    inference, to Daphne Moore, and the government should so

10   understand it.

11            MS. WAGNER:  Understood, your Honor.

12            THE COURT:  All right.

13       So, Mr. O'Connor, my next question to you is I --

14   let me tell you where I am in my analysis here.

15       I had read all the papers as is my want.  The

16   actual transcript of the interview accompanied by a CD

17   was not received by me really until this morning.  Again

18   I'm not being critical of anyone, but I'm not going to

19   make any determination today because voluntariness is at

20   issue and I can see that my duty is not only to read the

21   transcript but to listen to the actual inflections and

22   the voices of the people on this CD.  So assume that I'm

23   going to do that.

24            MR. O'CONNOR:  Yes, your Honor.

25            THE COURT:  If I do that, I have to say I

1    don't see the need for an evidentiary hearing.  I'm

2    prepared on the law because your memorandum and

3    affidavit certainly alerted me to it.  But I ask you,

4    are you pressing for an evidentiary hearing beyond the

5    data that I have before me?

6              MR. O'CONNOR:  Your Honor, I think it would be

7    appropriate because, um, some of the issues that we

8    raise in our brief -- perhaps some of the more central

9    issues that we raise in our brief, have to do with the

10   unrecorded portion of what happened that day, um, and

11   what's reflected in the police report, not necessarily

12   what's reflected in the recording or the transcription

13   of the recording that I know has been submitted to the

14   court.

15             THE COURT:  All right.  And what -- because

16   while it is the government's burden of proof on

17   voluntariness, from what sources do you want to

18   introduce evidence?  Whom do you want to call?  Whom do

19   you want to have called?

20             MR. O'CONNOR:  Well that's a tough question,

21   Judge, because it is their burden and I don't

22   necessarily want to, um, assist them in meeting the

23   challenge, but I think it's pretty well laid out in my

24   brief.  The real issue is, um, the circumstances around

25   the waiver in the first place.

1           THE COURT:  No, no, if we're going to argue it

2      and I give you an evidentiary hearing, we'll argue it

3      then.  But if you don't mind, let's go back to

4      Ms. Wagner.

5           While I'm certainly going to do what I just said I

6      was going to do, isn't the better part of value for you

7      to put on the evidence to persuade me, recognizing that

8      I will have read and listened to all of this, such other

9      evidence as you may wish to call to establish what -- I

10     know what your position is.  I don't need one.  I'm

11     thinking the better part of value is to have one.

12          MS. WAGNER:  Your Honor, the government would

13     be happy to produce Special Agent Meehan, he was

14     unavailable today, otherwise I would have had him in the

15     court just in case.  He's out of state.  But we would be

16     happy to bring him on and essentially go over -- what

17     the government would elicit from him would be

18     essentially what is in their investigation that you

19     would have had or will have the opportunity to read --

20          THE COURT:  I see I have police reports, but

21     that's not the same thing as the recorded -- I wasn't

22     saying I'm accepting police reports for evidentiary

23     weight -- I don't fault you in giving them to me, but

24     you need a witness for that.  So what you're saying is

25     you'll produce such a witness?

1          MS. WAGNER:  Essentially that's what I was

2     saying, was that the expected testimony would be

3     consistent with the police report that you have there.

4     Additional details that the agent would be able to offer

5     with respect to some allegations that the defendant has

6     made with respect to availability of her --

7          THE COURT:  I'm of a mind to give an

8     evidentiary hearing and I'm of a mind to do it in

9     Boston.  I mean -- I mean I'll be out here for the

10    trial.  I have other cases.  I mean you know this, it's

11    no surprise, each time I come, that's a day.  So let's

12    see if we can't -- the Clerk will suggest a time in

13    Boston where we -- where I will have read and listened

14    to what I said I would, we'll then receive evidence and

15    have argument on that motion.

16          (Pause.)

17          THE COURT:  How about 9:00 next Thursday, the

18    16th?

19          MS. WAGNER:  That would be fine, your Honor.

20          THE COURT:  And Mr. O'Connor?

21          MR. O'CONNOR:  Yes, your Honor, that's fine.

22          THE COURT:  All right.  And Ms. Moore-Bush has

23    every right to be present and so we're going to have to

24    see to that.  Very well, we'll schedule in Boston for

25    that time.  So that brings us -- but I won't entertain

1    any further argument on that.

2         So that brings us to the pole-camera motion and

3    I've indicated that it's serious.  What does -- does the

4    government intend to use pole-camera evidence?

5                   MS. BURKART:  Yes, we do, your Honor.

6                   THE COURT:  As against both defendants?

7                   MS. BURKART:  That is correct.

8                   THE COURT:  All right.  I think there are

9    significant issues that, um, appertain to such evidence

10   and on this it's the government's -- it's the defense's

11   burden, I would think, to, um, ground a suppression

12   motion and so I will hear defense counsel.

13        Who wants to start?  This is not openended.  You

14   will understand that I have read your briefs, that's why

15   I think it's a significant motion.  I've read what I

16   think are the significant Supreme Court and First

17   Amendment cases.  This is an evolving area of the law.

18                   MS. THOMPSON:  I agree.

19                   THE COURT:  So being succinct, I'm eager to

20   hear your argument.

21        Ms. Thompson.

22                   MS. THOMPSON:  If you -- you're not inclined

23   to have an evidentiary hearing, I take it then?

24                   THE COURT:  No, I don't what -- what's an

25   evidentiary hearing going to give me?

```
1              MS. THOMPSON:  Well, first of all, the
2    information that we have about exactly how these cameras
3    work, what kind of cameras they were, how they got to be
4    where they are, those are not issues that are clear in
5    the discovery, and when I was doing my research on this
6    matter I did read, um, Judge Sorokin's --
7              THE COURT:  Indeed.
8              MS. THOMPSON:  His opinion.
9              THE COURT:  As have I.
10             MS. THOMPSON:  And I noticed that there was a
11   substantial amount of information in that opinion about
12   the kinds of cameras that were used.  So that I think
13   that the record of the kinds of cameras, the kinds of,
14   um, if there was any audio, how they are controlled,
15   where they are controlled from, I think those are all
16   important issues.
17             THE COURT:  Well --
18             MS. THOMPSON:  In this case.
19             THE COURT:  Well maybe I'm -- and perhaps I
20   am, Ms. Thompson, but maybe I'm a little too simplistic,
21   but let me set out the parameters, and the government
22   should correct me as to any of any of these to the
23   extent they're factual matters.
24        It seems to me that the erection of this pole
25   camera involved no trespass on Ms. Moore's property, um,
```

1    that the cameras, um, or camera was able to make real-

2    time recordings and could be operable from a remote site

3    off the property, and had the capacity to zoom in.  That

4    this was indeed, um, continuous coverage, at least

5    continuous coverage for portions of the surveillance,

6    and was not simply a still photo taken periodically.

7         Well let me turn to the government and say are all

8    those assumptions in fact the case?  Ms. Barsky.

9              MS. BURKART:  Yes, that's accurate, your

10   Honor, there's no trespass, the utility pole is across

11   the street.  The affidavit, that is quoted by both the

12   defendants and the government, does lay out that in

13   real-time it was possible for agents to zoom and that it

14   was continuous coverage for approximately 8 months.

15             THE COURT:  That's right.  But let me press.

16   Did you zoom, are we going to see zoom pictures if I let

17   this in?

18             MS. BURKART:  Your Honor there have been

19   produced in discovery, to the defendants, the images

20   that were taken from the pole camera and they do show

21   that when, um -- so I don't think that there is a

22   factual dispute about it, that when it is in the

23   unzoomed view it is Ms. Moore's driveway and a portion

24   of the side of her house and that it is possible to zoom

25   in and see things like license plate numbers and other

1   sort of information from that view, and both of those

2   images have been produced in discovery and the

3   government would expect to be using them at trial.

4   There is no audio, your Honor.

5          THE COURT:  All right, I'm -- I'm going to

6   accept all those things factually and I don't see the

7   need for any more detailed recitation.

8       Ms. Thompson, I'll hear you.

9          MS. THOMPSON:  Thank you, your Honor.

10      We agree with the Court that this is an evolving

11  area of, um, case law and, as the Court knows, we've

12  relied heavily on the *Carpenter* case, which I know is

13  not about a cameraman on an utility pole, but it does

14  expand the, um, expectation of privacy to documents that

15  are in the, um, control of third parties, that is there

16  are new privacy expectations, I think, that arise in the

17  *Carpenter* case, and in *Wurie* and *Riley* and *Jones* and the

18  cases that we have cited.

19      So what we have here is a situation where

20  unlike -- and I know that the, um, the cases -- some

21  cases that have dealt with this have said that we live

22  in an age of, um, surveillance cameras at businesses and

23  places like that.

24          THE COURT:  But this is not a security camera.

25          MS. THOMPSON:  Absolutely not, it's not a

1    security camera, it's not a camera that a neighbor put

2    up, this is the government.  This is the government

3    deciding to have a continuous coverage, which they can

4    continually search, that is, um -- because they have

5    this -- and I don't know how the search -- how to search

6    this camera, the film, once it's been taken, but I'm

7    assuming it's digitally searchable and that the

8    government can go back and search again and again over

9    this 8-month period, and that that 8-month period is,

10   um, covering -- I don't know how much time they actually

11   spent zooming in and zooming out, we would know that

12   from a -- we could find that out.  But that it's the

13   kind of situation where I don't think the average person

14   -- I know that certainly I would not expect you, Judge,

15   or me to consent to having someone search, um, videotape

16   the front of my house or the side of it.

17              THE COURT:  Well, look, you're calling it a

18   "search."  Both of our houses, um -- and I haven't

19   checked, Ms. Thompson, but both of our houses, I would

20   imagine, are on Zillow and they're on Google Earth and

21   there are pictures taken at different times.  One of

22   mine has someone out in the yard.  Not that I check all

23   the time.  But the picture of the house is there.

24              MS. THOMPSON:  Is it on Zillow?

25              THE COURT:  I will admit mine is, um, and I'm

1    not selling.

2              (Laughter.)

3              MS. THOMPSON:  Well I don't know because I

4    haven't looked for mine.  But I know that although

5    Zillow is an enormous organization or business, it's not

6    the government, and so while we might expect that

7    Zillow, or Google Earth, will take a look at us every

8    once in a while, we don't expect them to just focus on

9    our home, and who comes and who goes and what time they

10   come and what time they go, and who comes with them and

11   who goes with them, and what time Ms. Moore goes to work

12   and what time Nia Moore-Bush leaves the house and who

13   she leaves with and what her children do, and who comes

14   to pick up the children and who brings the children

15   home.  This is an extremely, um, it becomes extremely

16   personal as it goes from day to day to day for an 8

17   month period of time.  And one of the things that makes

18   it so personal, it's this permanent record, and it can

19   be searched over and over again by the government.

20             There's no reason to think that they are

21   necessarily through searching this, um, video feed for

22   what Ms. Moore is doing, but I think that the ability of

23   the government to see what you are doing, when you are

24   leaving your house, who is coming to your house, what

25   time you are leaving, what time you are coming back, is

1   really pretty -- an invidious invasion of privacy.  They

2   may not -- they may say that they don't want to use all

3   of that, but the fact of the matter is they have the

4   ability to use all of that.

5          THE COURT:  But surely you've, I'm sure,

6   defended cases and I have presided over cases where on

7   mere suspicion there have been stakeouts, for

8   instance -- I don't recall one of 8 months, but I had a

9   drug case, and I use it in teaching evidence, where

10  there was -- and it just comes to mind, where there was

11  a stakeout of a fellow by the name of Patrick Cole, um,

12  in one of my cases, and no opinion was ever written on

13  it, and I just recall the facts of the case, a physical

14  stakeout, um, a police officer in plain clothes located

15  across the street, and what he was doing is just that,

16  he was watching when Mr. Cole -- and he was living with

17  a young woman, and when the young woman came and went,

18  that's what they were doing.

19         Now that was before *Carpenter* and before cell

20  phones -- if one can imagine that civilization in fact

21  existed before cell phones, but law enforcement did its

22  work and there was no challenge at all, that I recall,

23  and everyone thought "Well, that's fine police work that

24  they are in fact scouting out those premises."  I have

25  no -- and I still have no problem with that, law

```
 1   enforcement has been doing that for decades.  I take it
 2   your argument is the pervasiveness of the pole camera
 3   for 8 months, a pole camera that will do what Ms. Barsky
 4   forthrightly explains it will do, it can zoom in and the
 5   like.
 6              MS. THOMPSON:  Right, it's that 8-month period
 7   of time, because certainly when you read *Carpenter* and
 8   the cases that precede it, you understand how convenient
 9   it is for the government to stick a pole camera up -- to
10   stick a camera on a utility pole and just have it run,
11   and that saves manpower and person-power, however you
12   want to deal with it.  And of course I don't know if in
13   the Patrick Cole case that person was sitting there in a
14   car with a camera.  And if that person was sitting --
15   the law enforcement officer was sitting there with a
16   camera, that might have raised a different issue for the
17   court.  But it was --
18              THE COURT:  Well let me ask you this.  There
19   must be some period of time, without getting a warrant,
20   that they can surveill suspicious premises?  I mean
21   won't you concede that?
22              MS. THOMPSON:  Well, Judge, you know me well
23   and I don't concede things very easily, but I do agree
24   that the period of time in which somebody could do that
25   without a warrant might be the period of time that
```

1    somebody would be able to stand there with a camera and

2    take the pictures or sit in a car and take the pictures.

3    But we all know that that's not going to happen for 8

4    months.

5                THE COURT:  No, but the reason I ask that

6    question, and I will ask it of the government, and

7    whether or not we need an evidentiary hearing?  Since

8    it's -- the government agrees it was operative for 8

9    months.  It might be worthwhile knowing when the photos

10   of evidentiary value originated, in other words were

11   they in the first week, month, et cetera, in the 7th

12   month and the like?  Do I have some line-drawing to do

13   here?

14               MS. THOMPSON:  I think, um, from what I can

15   tell by the discovery is that the, um, the camera had

16   been up mid May, June, July, August, September, October,

17   and I think it was October and later that they

18   started -- that the photographs that are -- that the

19   government intends to use.

20               THE COURT:  That the ones of evidentiary value

21   appear to be late in the --

22               MS. THOMPSON:  Very late.  So there was a long

23   period of time.  And I can tell you, I did not provide a

24   huge hard drive, because I'm not going to look at all of

25   those pictures.  I don't know whether there were --

1              THE COURT:  No, I -- it's a proper question

2      for the government and I will put it to them.

3              MS. THOMPSON:  -- ambulances that came or --

4              THE COURT:  So as I -- and this does not, in

5      any way, shortchange your argument, you're in sort of

6      the 1L best-case approach, but *Carpenter* is what you're

7      really pinning your hat on, and you, um, point out that

8      *Carpenter* is the most recent case and, um, is most

9      persuasive for your point?

10             MS. THOMPSON:  I think *Carpenter* is

11     persuasive.  I know that there are courts that have

12     rejected this argument on *Carpenter,* there are courts

13     that have accepted it, and that a lot of it hinges on,

14     oddly enough, the location of the property.  And so this

15     property, 120 Hadley Street, is located in a quiet

16     residential area.  And of course everyone suggests,

17     "Well, the neighbors can walk up and down there and see

18     what's going on," and all of that, and that's what you

19     expect in your neighborhood, you expect your neighbors

20     to know what's going on in the neighborhood.  But you

21     don't expect them to be taking real-time videos of

22     everything that goes on at your house.

23         So this is qualitatively quite different than

24     having your neighbor snap a shot of you in your house or

25     by Google Maps or Zillow, this is a record that is a,

1   um, permanent record of what went on at your house for 8

2   months.  And I think that that, um -- that *Carpenter*

3   will -- I think that will be addressed again in the

4   future.  I think that 8 months is an incredibly long

5   period of time to have a camera in place.

6        I haven't -- of course there are other things I

7   expect to address the Court about with regard to long

8   periods of time and searches, but I do think that when

9   you have a recording which you can search, that you have

10  created a search situation, and that a court would be

11  inclined perhaps to say, "Well, you've shown me probable

12  cause to think that on Thursday and Friday of every

13  other week people come around, so I can give you two

14  weeks or I can give you Thursday and Friday for two

15  weeks."  But this is just a free-for-all, this is just

16  anything you want all of the time for 8 months.

17       And I think that the Fourth Amendment -- when I

18  look at the cases that have dealt with *Carpenter* and the

19  pole-camera issue, what I see is -- I don't suspect -- I

20  know this, I expect -- I expect privacy at my house, and

21  so I could put up a sign in the yard that says "Don't

22  come on my sidewalk," but you could still take a picture

23  of my house.  I could, um --

24            THE COURT:  Well, you don't need a sign

25  because anyone can do that.  For one thing, if I

1    understand my property law, they can walk on the

2    sidewalk because it's an easement -- at least the

3    sidewalk in front of my house is an easement of the

4    town.  We need children to walk on the sidewalk to get

5    to school and the like.  And I can't stop people from

6    taking pictures of the house.  And for a Fourth

7    Amendment analysis, I don't have an expectation that I

8    can stop them.

9            MS. THOMPSON:  Judge, I have a sidewalk that

10   leads from the public sidewalk up to my house.

11           THE COURT:  Oh, I see what you mean.

12           MS. THOMPSON:  And I could put a sign there

13   saying "You can walk on that sidewalk, but not this one.

14   Don't come up here."

15           THE COURT:  You could because --

16           MS. THOMPSON:  I could build a huge fence in

17   front of my house.  I could put bushes in front of my

18   house.  But people aren't really expected to do that,

19   their home is their place of privacy.  And so you're not

20   expected to have to build a wall around your house,

21   people can't even afford that.

22           THE COURT:  The language of the Founders is

23   still good today, everything is what is reasonable in

24   our society.

25       I think I understand your argument.  It's well-

1    briefed.

2          Mr. O'Connor, you join in this argument because

3    the evidence would come in against your client as well.

4    Do you have anything to add?

5          MR. O'CONNOR:  Perhaps, your Honor, and I

6    don't know if it would be helpful, but I'd like to add a

7    few thoughts.

8          THE COURT:  I'll be happy to hear you.

9          MR. O'CONNOR:  So first with regard to, um,

10   you know the comparison between security cameras and a

11   pole camera, I think there's a couple of distinctions.

12   One, security cameras are often visible.  Part of the

13   purpose sometimes of a security camera is to let people

14   know that they're under surveillance so that they don't

15   do anything --

16         THE COURT:  I hear your -- you're arguing here

17   now to the choir, it's the government who has cited some

18   security camera cases.  I don't think security cameras

19   are the situation we have here.  But it's not so much

20   whether they're visible or invisible, a security camera

21   is in position to provide security generally, that's why

22   they're there, but here the government is targeting this

23   premise, these premises, and evidently -- and they're

24   certainly not going to argue to the contrary, because

25   they believe there is suspicious activity of the people

1   coming and going from these premises, without probable

2   cause, and that's where we start.  So the security

3   camera cases don't seem to this court to be apt.

4        I have a hard time saying it's a "search" because

5   of course it's outside the close, it's on the public

6   area, it's across the street.  If you flew a drone up to

7   the second-story window or something, that would be a

8   different case, but that's not our case.

9        But go ahead.

10              MR. O'CONNOR:  Yeah, so I do see what your

11  Honor is saying, but I think the larger point that I was

12  making is that with security cameras, knowing where they

13  are, then with a limited purpose, you can preserve your

14  -- or protect your own privacy by making choices about

15  what actions you do.  You don't have to be in the

16  parking lot of the 7-11.  Here they had no choice, this

17  is where they live.  This is the place that our Founders

18  also recognized was our place of retreat, our place of

19  peace, the place where we should expect to be free from

20  the exercise of the arbitrary power of the government.

21        And so we now have a situation where the

22  government can erect a discreet -- a hidden camera that

23  has functions that are probably far beyond what a

24  security camera does.  This thing can be targeted

25  clearly, at least at a minimum it can be zoomed.  I

 1    don't know if it has the capacity to pan or not, we

 2    don't know that, but it can zoom in and it can zoom in

 3    to a relatively high magnification.  Again we don't know

 4    to what extent it can zoom in for purposes of

 5    magnification.  I don't know whether it has the capacity

 6    to zoom in so tight on the front windows that now they

 7    can see what's happening in the living room.  But it

 8    seems that --

 9               THE COURT:  I'm assuming "No," based upon what

10    the record is and how Ms. Barsky answered my question,

11    that they can't do that.  They can zoom in to see

12    license plates and at about that level of magnification.

13    But I don't -- there's no evidence here that they could

14    see the interior of one's home.

15          Correct, Ms. Barsky?

16               MS. BURKART:  It's "Burkart," your Honor.

17               THE COURT:  Ms. Burkart.  Please forgive me.

18    I do apologize, Ms. Burkart.  And I thank you for the

19    correction.  But substantively the answer's "No," you

20    can't see inside?

21               MS. BURKART:  That's absolutely correct, your

22    Honor.

23               THE COURT:  All right.

24               MR. O'CONNOR:  So the point that your Honor

25    makes about zooming in to look at license plates, boxes

1    are frequently left at our mail boxes.  Somebody
2    conducting surveillance, traditional surveillance, would
3    have to figure out a way to get up to that box to see
4    what the return address is, to see who you're leaving it
5    for the mail person or --
6         THE COURT:  I don't know as they can see
7    return addresses, but they might see that it's a Prime
8    box, for instance.  But someone with binoculars can do
9    that.
10        MR. O'CONNOR:  Perhaps, your Honor, but not
11   every single day for every single box that would be left
12   there for every single license plates that comes and
13   goes for 8 months.  These are the things of life.  These
14   are associations.  The people who may come by to meet
15   with us, they could be liaisons, they could be trysts,
16   they could be things that would otherwise be genuinely
17   absent from spot surveillance or surveillance down the
18   street.  And I would go further to say that in a
19   residence like Ms. Moore had -- and this is a quiet
20   suburban neighborhood, if there was a couple of people
21   sitting there eating ham sandwiches and drinking coffee
22   and sitting around with binoculars, again she would have
23   the capacity to protect her freedom, and I think that
24   that is lost here.
25        And I would say with regard to where *Carpenter*

1   appears to be going, and your Honor's comments about

2   Zillow or Google Earth, you know I moved recently, so I

3   have an experience with Zillow.  You actually have the

4   capacity to go on Zillow, claim ownership of the home,

5   and take the photographs -- for example of the interior

6   of your house, off of Zillow.  So you have some control

7   of that.

8           THE COURT:  Well again it's all very well to

9   use analogies in order to understand what we're talking

10  about.  No one's talking about interior photographs and

11  the like and nor was I suggesting that.

12          MR. O'CONNOR:  But what I'm saying, your

13  Honor, is, you know, there's an expectation of privacy

14  that comes along with that capacity.  This is a

15  collector of data and information --

16          THE COURT:  But of course, just as you're

17  arguing, but that's the interior of your home.  They're

18  not looking in the interior here.

19          MR. O'CONNOR:  Right, and what's left is --

20  there is something left though, your Honor, there's left

21  a picture of the exterior of my home taken in an

22  instant, it's one moment in time.  My old house, the

23  Google photograph from above the earth had the old

24  above-ground pool that was taken down for years.  So

25  these are moments in time, they're snapshots, they don't

1    contain the same data and information.

2          And I think that what *Carpenter's* recognizing is

3    that, as surveillance goes from a couple of detectives

4    in a car using binoculars, when they can do it, to this

5    technology that's ubiquitous that gathers so much and

6    has the capacity to gather so much evidence, that if we

7    don't do something to cabin the government's use of it,

8    we lose our freedoms entirely, and our perception of --

9          THE COURT:  Judge Sorokin wrote, very

10   carefully, and I hold him in enormous high regard, that

11   he was bound by the First Circuit's precedent in *Boch*.

12          MR. O'CONNOR:  In *Boch* or *Bucci*, your Honor?

13          THE COURT:  *Bucci*.  I'm sorry.

14          MR. O'CONNOR:  Your Honor, I think because

15   *Carpenter* post-dates it and so --

16          THE COURT:  It does.

17          MR. O'CONNOR:  And so the Supreme Court's

18   recognizing that.  You know the First Circuit at that

19   point in time is following Supreme Court precedent that

20   talks about a reasonable expectation of privacy as it's

21   evolved from --

22          THE COURT:  You answered my question.  And so

23   in order to -- I'm going to -- if I go your way, like

24   you're depending on *Carpenter*, I'm depending on

25   *Carpenter*, because otherwise I'm bound by *Bucci.*  Right?

1           MR. O'CONNOR:  Yes.

2           THE COURT:  Thank you.

3       All right, Ms. Burkart.  And again my apologies, I

4   do -- I do try to get people's names straight.

5       Would you answer the factual question, which was a

6   supposition on Ms. Thompson's part, that the evidence

7   you seek to produce comes in months when, 7 and 8?

8           MS. BURKART:  Your Honor, I'm not actually

9   certain particularly what photos we're going to use in

10  this stage in the case.  If --

11          THE COURT:  But that would tend toward an

12  evidentiary hearing.  What can you tell me on that?

13          MS. BURKART:  I don't think so, your Honor,

14  because I think that the facts that are undisputed and

15  the case law that is undisputed makes it clear that the

16  government should be able to use images from any point

17  during that time.  *Bucci* was an 8-month period of time.

18  And I believe that Judge Sorokin's analysis is correct,

19  both pre and post *Carpenter,* and is controlling.

20          THE COURT:  Why is it correct post *Carpenter*?

21  I mean they're dependent on *Carpenter*.  And I think --

22          MS. BURKART:  Absolutely, your Honor.

23          THE COURT:  And I think, analytically, rightly

24  so, whether that works or not is yet to be seen.

25          MS. BURKART:  *Carpenter* dealt with a very

1    narrow -- it had a very narrow holding and it dealt with
2    a very different type of technology.  So certainly I
3    think there's no dispute among the parties that our
4    world has changed quite a bit in recent years in terms
5    of how technology works and what is captured and that
6    certainly has some reasonableness -- I'm sorry, some
7    Fourth Amendment considerations.  But the threshold
8    issue here is not changed by *Carpenter* because it is
9    what is reasonable?  Is this a search?  What is a
10   reasonable expectation of privacy?  *Carpenter* does not
11   change what is reasonable about your expectation of
12   privacy in the exterior of your home.
13        Carpenter said very clearly that they were making
14   a narrow holding about cellular information, location
15   information that was historical, um, they were very
16   specific about it, and I think for good reason.  The
17   *Carpenter* court talked about the evolution of that
18   technology and how historical cell-site information has
19   gotten more and more precise, and they said to the point
20   where at this stage they view that the data that's
21   available through historical cell-sight information to
22   be much like a tracker, that you could give, for a long
23   period of time, very detailed encyclopedic information
24   about where someone went, and that that could extend
25   into interiors of spaces, that that could show

1    information about, um, which places of worship they went

2    to, their travels, and they were very concerned with

3    that level of intrusion, a tracker-like device on

4    someone for an extended period of time.  And they

5    actually went so far as to, you know, say it's not --

6    it's any period of time, it's, you know, beyond 7 days

7    was the issue in front of them on that.  Why didn't they

8    even need their holdings to say beyond the 6-day period

9    of time?  They thought that the threshold had been

10   crossed.  But they were very clear in *Carpenter* that

11   that was the technology that they were talking about,

12   that it was that increased ability to track people that

13   they were concerned about.

14        And there had been a number of cases since

15   *Carpenter* that have sought to apply the holding of

16   *Carpenter* to a different set of technology, a different

17   set of, um -- a different situation, and the courts have

18   rejected that, um, pretty routinely.  And in every case

19   that I'm aware of in the pole-camera setting, the courts

20   have rejected that.  There is no post-*Carpenter* case

21   discussing pole-camera technology.

22        *Vargas,* which was the case that was discussed by

23   Judge Sorokin, it was raised by the defendants, was

24   2014.  I did not find any, nor did I see in the

25   defendant's briefs any -- and they're welcome to correct

1   me if I'm wrong, but I've seen no extension of the

2   *Carpenter* decision to pole-camera data.  I think that's

3   because pole cameras are really not the type of thing

4   that they were concerned about in *Carpenter*, it's fairly

5   old-school.  Whether it can zoom or not?  It's a type of

6   surveillance, a technique that law enforcement has been

7   using for a long period of time.

8        It would be a very significant and I think an

9   unwarranted extension of *Carpenter* to take the idea that

10  *Carpenter* embraced -- you know, privacy rights are

11  something that we have to consider more carefully in the

12  area of new technology, and extend that to pole cameras,

13  which have been used by law enforcement for a very long

14  period of time.

15       And so I think the holding in *Bucci* is

16  controlling.  I think, um, Judge Sorokin's very careful

17  analysis shows that he was quite sympathetic to the view

18  that this emerging technology is something that could be

19  of concern later, but he said very clearly *Bucci*

20  controls here, and I don't think *Carpenter* changes that.

21       I think as a threshold issue we continue to have

22  is this a reasonable expectation of privacy?  It's not a

23  search if there's not a violation of the reasonable

24  expectation of privacy.  Objectively *Bucci* controls.

25  They have not shown that.  Subjectively none of the

1    defendants has put forward any type of affidavit or any

2    type of information that suggests that subjectively they

3    have demonstrated an expectation of privacy, again in

4    that exterior of the home.  Certainly some of this

5    discussion has talked about the sanctity of the home,

6    that's a serious Fourth Amendment concern, but there's

7    no suggestion here that we have invaded that.

8         And one can imagine that if the technology were to

9    become, you know, very significant, we were able to look

10   inside homes and things like that, then those images, I

11   would expect, would be the exact images the defendants

12   would bring forward and say "This is a violation," but

13   we don't see that here.  We see the driveway and people

14   coming and going from the driveway, the license plates,

15   and sometimes you can see the drivers.

16        If there were a box or a series of boxes, your

17   Honor, I would argue we could get that under mail cover,

18   but that might be sort of an area that maybe we should

19   take an evidentiary hearing, maybe we should look more

20   closely.  Is this some type of new technology that is

21   really raising new concerns?  We don't have that here.

22   What we have is a failure to meet the threshold of a

23   reasonable expectation of privacy, both objectively and

24   subjectively, and nothing in *Carpenter* that overrules

25   the holding in *Bucci*.

1          THE COURT:  Don't think I'm going here, but
2     let me just put it to you.
3          If I allowed this motion, in whole or in part, or
4     allowed it for a period of the 8 months, that affects
5     your whole case, doesn't it?
6          MS. BURKART:  I think it's a significant
7     impact, your Honor.  As you know I've -- I've recently
8     joined the case team and am getting up to speed in terms
9     of the facts.  I do think it's a threshold issue, though
10    that doesn't have to be decided right here, and I do
11    think it would be a line-drawing that's unwarranted
12    under current case law if we were to say, you know, "We
13    need to carve to this period of time or that period of
14    time, this is reasonable, this isn't reasonable."  I
15    think the threshold issue under what is still good
16    jurisprudence --
17         THE COURT:  I understand that's your --
18    believe me I understand your argument.  I'm thinking of
19    what may happen because you are the, um --
20         Do the wiretap warrants depend on it?
21         MS. BURKART:  The wiretap warrants discuss the
22    pole cameras as part of discussing why it is necessary
23    to have the wiretaps.  So obviously one of the
24    exhaustion requirements --
25         THE COURT:  So that the pole camera was not

1    sufficient?

2            MS. BURKART:  Precisely, your Honor.  And so

3    that is actually the portion that's quoted here.  And in

4    some ways it cuts against the defendant's arguments that

5    the pole camera is such a significant intrusion because

6    what the defendant --

7            THE COURT:  Because the wiretap intrusion

8    requires the exhaustion of other things that you might

9    do.

10           MS. BURKART:  Precisely, your Honor.  And it

11   shows how limited the data that one can really get from

12   a pole camera is.  And it's where, I think, for instance

13   the discussion of the one tree that partially obfuscates

14   the view of the pole camera actually cuts to the

15   government's position, is that, you know, this is on a

16   utility pole across the street.  And so when you're

17   taking the position of, you know, what is reasonable for

18   people to think is protected, what privacy interest is

19   society prepared to recognize as reasonable?  Knowing

20   that it was obscured in part by a tree is something that

21   actually shows that it was even less of an intrusion,

22   um, than it might be had there been a full clear view of

23   the entire exterior of the home.  Again it really goes

24   back to what objectively can one expect to be private

25   about the exterior of the home.

1              THE COURT:  All right.  Thank you.  I'm going

2     to take the matter under advisement.

3          Since we're here together and since trial is in

4     the fairly-immediate offing, let's cover those things

5     which -- let's use this as a final pretrial conference

6     and go over certain matters.

7          The trial is starting on Monday, the 10th of June.

8     The government will, by the 20th of May, if they have

9     not already done so, make all those disclosures which

10    are required under Local Rule 116.  The government will,

11    by the 3rd of June, disclose its witness list.  The

12    defense will make the reciprocal disclosure by Wednesday

13    the 5th of June.  Any stipulations, motions in limine,

14    and the like, will be filed by Friday the 7th of June.

15         I propose -- well, let me ask a question.  With

16    the case in its present posture, how long do you think

17    it will take to try this case -- without holding it to

18    you, either Ms. Wagner or Ms. Burkart?

19              MS. WAGNER:  Your Honor, just to clarify, the

20    Court will be running or the trial will be running for

21    half days or until 1:00 or 2:00?

22              THE COURT:  Yes.  I was sort of thinking maybe

23    9:30, but not going to lunch about 1:30, and maybe

24    calling that a day.

25              MS. WAGNER:  So 9:30 to 1:30.  I think that

1    the government would be able to enter its case in chief

2    well under -- between 2 weeks and 3 weeks, depending on

3    cross-examination.

4              THE COURT:  It was 2 weeks the last time I

5    asked, now it's up to 2 or 3 weeks?

6              MS. WAGNER:  Well it's 2 weeks, your Honor, we

7    could do that, I'm just anticipating there might be

8    extended cross-examination that the government can't

9    anticipate.  So for our case, we certainly could get it

10   in by 2 weeks.

11             THE COURT:  I find it hard to think that you

12   will in fact use up 2 weeks.

13        As a practical matter, Ms. Thompson, Mr. O'Connor,

14   you've tried these cases, how long do you really think

15   we're going to take on this?

16             MS. THOMPSON:  Well, I have to say, Judge,

17   that, um -- before I address that, I wanted to address

18   the government's motion for a protective order.

19             THE COURT:  Oh, I had not addressed that.

20             MS. THOMPSON:  Which I have opposed.

21             THE COURT:  Oh, I see that, I see you've

22   opposed it.  I'm not sure I really understand it.  I've

23   not entered any such protective order.

24             MS. THOMPSON:  And I am not getting discovery

25   because of the motion for a protective order.

1          THE COURT:  Well what discovery do you think
2     you're entitled to that you're not getting?
3          MS. THOMPSON:  Well I'm not getting
4     information about cooperating witnesses, um, which --
5     the way I read the local rules, Judge, is if there was
6     going to be a motion for a protective order that was to
7     be filed during that 28-day period so that I would know
8     where I was going to, um -- I can't specify what I'm not
9     getting because the government hasn't said in their
10    motion what they're not going to give.
11         THE COURT:  I'll rule promptly on that.
12         All right.  Let's, um -- Mr. O'Connor, do you want
13    to take a shot at the question I posed?
14         MR. O'CONNOR:  Your Honor, I think that's
15    probably a pretty accurate description.
16         THE COURT:  A couple of weeks?
17         MR. O'CONNOR:  Yeah, I think so.  It could
18    possibly bleed into that third week.  I haven't tried a
19    case in front of your Honor, so I don't know how fast it
20    moves along.
21         THE COURT:  Um, I hope I'm not terribly
22    idiosyncratic, I -- most -- more than anything else I
23    desire a fair and impartial trial, time is not that
24    important, it's just we need to make effective use of
25    the time.  That's why I ask.  It's a criminal case, I

 1  can't hold people to time, and I do not.

 2       I'll impanel 14 jurors, that means the government

 3  has 7 peremptories, the defense has 11.  In a -- if both

 4  defendants go to trial, a multidefendant case, the

 5  objection of one is the objection of all, unless

 6  counsel, um, seek to take a different position and state

 7  the different position.  So it's not necessary for both

 8  to object.

 9       I'm open to questions about the conduct of the

10  trial.  And I will rule promptly on this protective

11  order issue.

12       Questions by the government?

13            (Silence.)

14            THE COURT:  Questions from the defense?

15            MR. O'CONNOR:  None for Ms. Moore-Bush, your

16  Honor.

17            MS. THOMPSON:  I have a matter in which I

18  would just like to briefly make a record, Judge, that is

19  on the wiretap, which has been denied without a hearing,

20  it is our position that Ms. Moore was intercepted at all

21  times without a warrant and without probable cause.

22  Every affidavit, um, says "We don't have probable cause

23  as to Ms. Daphne Moore."  Every application says "We

24  lack probable cause as to Daphne Moore."  She was

25  intercepted throughout the entire part of the wiretap.

1   And I think that Judge Mastroianni made it clear that

2   her conversations were not expected to be relative to

3   the -- to one of the specified offenses, and they were

4   not pertinent, could not be expected to be pertinent to

5   those.  And so I have a warrantless intercept as to

6   Ms. Moore, her name was crossed out and her name

7   thereafter was always put forward as someone as to whom

8   they did not have probable cause on each of the three

9   applications and each of the three affidavits.

10                  THE COURT:  Her rights are saved.

11                  MS. THOMPSON:  Thank you.

12          In addition, I have filed a motion for relief from

13   misjoinder.

14                  THE COURT:  Why is there misjoinder with the

15   case in its present posture?

16                  MS. THOMPSON:  Well Ms. Moore-Bush is charged

17   with firearms offenses.

18                  THE COURT:  I understand.

19                  MS. THOMPSON:  And Ms. Moore is not charged

20   with any firearm offenses.

21                  THE COURT:  I understand that.

22                  MS. THOMPSON:  And it's not clear from

23   anything that we see in the indictment whether money

24   laundering involves firearms offenses as well as

25   narcotics.  So --

1          THE COURT:  I've -- the motion is denied.

2    Your rights are saved.  We'll have a fair trial.

3        All right.  Questions on the part of the

4    government?

5          MS. WAGNER:  Yes, your Honor, I have not had a

6    trial in front of your Honor before, so I just have a

7    couple of small logistics questions.

8          THE COURT:  Go ahead.

9          MS. WAGNER:  The first is with respect to

10   openings and closings --

11         THE COURT:  15 minutes a side.  Well if two

12   go, they both get 15 minutes, you get a half hour.

13   Closings, they get a half hour, you get an hour.

14         MS. WAGNER:  With respect to chalks --

15         THE COURT:  That's not an invitation to use

16   that time, that may be counterproductive, but it's your

17   case to try.

18         MS. WAGNER:  Thank you, your Honor.

19       With respect to using chalks in openings, how does

20   the Court --

21         THE COURT:  I expect you to have shown them to

22   the other side --

23         MS. WAGNER:  Of course, your Honor.

24         THE COURT:  -- and I'll entertain objections

25   prior to the opening, but they're perfectly fine, if

1   there's no objection.

2           MS. WAGNER:  And then the last issue I wanted

3   to raise, your Honor, was how the Court wanted to handle

4   transcripts?  My understanding is that the initial

5   presentation of a transcript should not show the

6   speakers' names, and then once a witness has testified

7   about who is speaking on the recording, that it might be

8   entered.  I just want to --

9           THE COURT:  I'm not so -- transcripts are not

10  going to the jury.

11      They're speaking in English, aren't they?

12          MS. WAGNER:  They are, your Honor, it's just

13  an aid.

14          THE COURT:  Yeah, it's just an aid.  So the

15  aid can have your agent's interpretation of who's

16  speaking and the like because they'll have the

17  transcripts only while the tapes are being played and at

18  no other time and I will give a cautionary instruction.

19          MS. WAGNER:  Excellent.  Thank you, your

20  Honor.

21          THE COURT:  All right, hearing nothing else,

22  we'll see you next Thursday, at least Mr. O'Connor, for

23  the evidentiary hearing.

24          MS. WAGNER:  I'm sorry, your Honor, I did

25  forget one thing.

1          How does the Court do jury selection?  If you

2     could just give a few seconds on it?

3               THE COURT:  Yes.  I do jury selection like

4     this.  I'll have the venire in the courtroom.  You

5     people will have given me what you think is appropriate

6     as a precharge substantively and you will pose whatever

7     questions -- you will in writing give me whatever

8     questions you want me to ask.  I will ask the questions

9     I want to ask, which may include yours or not.

10          So I will introduce myself to the venire, ask them

11     the questions, they will raise their hand if they would

12     answer affirmatively.  Then I'll have them up one by

13     one, along with you, and I will inquire further of them

14     to decide whether they should sit.

15          When I've made that determination, and they've

16     stepped away, then if you disagree, either side, you

17     will say, "Judge, he should be challenged for cause."  I

18     will rule.  And if I decide to bring back someone I've

19     excused, they won't have left the courtroom by that

20     time, I will say "Oh, wait a minute, come back and sit

21     down."  Then when I have an indifferent panel, I'll fill

22     the box with 14 jurors.

23          I'll have each of the jurors introduce themselves

24     and tell us where the -- well they don't need to

25     introduce themselves, but they'll tell us where they

1    work and where their spouse works, and what -- and in a

2    few words what they do there.  That way you'll get to

3    hear them and see how they answer questions and the

4    like.

5           When that's done, we'll approach the sidebar and

6    you will exercise your peremptories.  Then without

7    filling the box the defense will exercise their

8    peremptories.  Then the, um, in the first round we'll

9    excuse those people and fill the box with remaining

10   jurors.  And in the second round the defense will go

11   first, so it's fair and so on and so forth.

12          The last two jurors picked are going to be the

13   alternates, but they will not know it until the trial is

14   over.  I will pick the foreperson.  I'm very strict on

15   ***Batson***.

16          Is that sufficient explanation?

17                MS. WAGNER:  Yes, thank you, your Honor, that

18   was very helpful.

19                THE COURT:  All right.

20          Anything else?  (Silence.)  Very well.

21                MS. THOMPSON:  Judge, are you committed to

22   selecting the foreperson?

23                THE COURT:  I am.

24          We'll recess.

25                THE CLERK:  All rise.

1          (Ends, 3:00 p.m.)

2

3              C E R T I F I C A T E

4

5          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

6    do hereby certify that the foregoing record is a true

7    and accurate transcription of my stenographic notes,

8    before Judge William G. Young, on Monday, May 13, 2019,

9    to the best of my skill and ability.

10

11

12    /s/ Richard H. Romanow 5-31-19
      _____
13    RICHARD H. ROMANOW  Date

14

15

16

17

18

19

20

21

22

23

24

25