UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA        )
                               )
          v.                    )        CRIMINAL ACTION
                               )        NO. 3:18-30001-WGY
NIA MOORE-BUSH and              )
DAPHNE MOORE,                   )
                               )
                Defendants.     )
_____)
```

YOUNG, D.J.                                          June 4, 2019

## AMENDED MEMORANDUM AND ORDER[*]

### I.  INTRODUCTION

Casual observations of a person's forays in and out of her home do not usually fall within the Fourth Amendment's protections.  Here, the defendants ask the Court to consider whether a precise video log of the whole of their travels in and out of their home over the course of eight months, created by a camera affixed to a utility pole that could also read the license plates of their guests, raises Fourth Amendment concerns.  After a thorough analysis of the parties' arguments and recent Supreme Court authority, the Court rules that it does.  Accordingly, the Court ALLOWS the defendants' motions to suppress, ECF Nos. 326, 358.

---

[*] This amended memorandum and order deletes a superfluous word in footnote 5 and corrects a citation in section IV.B.2.

## II.   BACKGROUND

### A.   Procedural History

A federal grand jury indicted defendant Nia Moore-Bush ("Moore-Bush") on January 11, 2018.  ECF No. 3.  Almost a year later, on December 20, 2018, the grand jury returned a superseding indictment naming defendant Daphne Moore ("Moore"), Moore-Bush's mother, as well.  ECF No. 206.  Moore and Moore-Bush moved on April 22 and May 2, 2019, respectively, to suppress evidence that the Government collected using a video camera installed on a utility pole across the street from Moore's house (the "Pole Camera").[1]  See Def. Daphne Moore's Mot. Suppress ("Moore Mot."), ECF No. 326; Def. Nia Moore-Bush's Mot. & Mem. Suppress ("Moore-Bush Mot."), ECF No. 358.  Moore-Bush and Moore argue that the Government's use of the Pole Camera constituted a search under the Fourth Amendment to the United States Constitution.  See generally Moore Mot.; Moore-Bush Mot. The Government opposed the motions to suppress on May 6, 2019. Government's Opp'n Defs.' Mots. Suppress Pole Camera Evidence ("Gov't Opp'n"), ECF No. 367.

On March 13, the Court heard oral argument on the motion and took it under advisement.  Electronic Clerk's Notes, ECF No.

---

[1] Defendant Oscar Rosario also moved to suppress the Pole Camera's video, ECF Nos. 321 & 332, but he pled guilty on May 13, 2019, thereby obviating resolution of his motion, ECF No. 393.

396.  For the following reasons, the Court ALLOWS the motions to suppress.

**B.    Facts**

The Court draws the facts from the parties' undisputed statements at the motion hearing and in their briefing.

The Government installed the Pole Camera on a utility pole across the street from Moore's house, located at 120 Hadley Street, Springfield, Massachusetts.  Gov't Opp'n 1.  The Pole Camera captured video of, but not audio from, events occurring near the exterior of Moore's house for approximately eight months.  Gov't Opp'n 2; Tr. 15:4, ECF No. 414.  During this time, Moore-Bush resided in Moore's house.  Gov't Opp'n 1.

The Pole Camera surveilled the driveway and part of the front of Moore's house.  Tr. 34:13-15; Gov't Opp'n 2, 4.  A tree partially obscured its view.  Gov't Opp'n 2.  Although the Pole Camera could zoom in so as to permit law enforcement officers to read license plates, it could not peer inside windows.  Tr. 26:5-22.  Law enforcement officers also could pan and tilt the camera.  Gov't Opp'n 3.  Additionally, law enforcement officers could operate the Pole Camera's zoom feature remotely.  Tr. 13:19-14:14.  The Pole Camera produced a digitized recording that the Government could search.  Tr. 16:2-16.

Although the Government has not stated the exact nature of the evidence that it seeks to admit from the Pole Camera, the

parties assume that the Government will introduce video, much of it the Pole Camera recorded well into its eight-month existence. Tr. 20:5-23, 35:1-14.

## III. LEGAL FRAMEWORK

Moore-Bush and Moore argue that the Pole Camera's eight-month video log of Moore's house constitutes an unconstitutional search.  Moore-Bush Mot. 1; Moore Mot. 1.

The Fourth Amendment to the United States Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Government does not justify its use of the Pole Camera with a warrant or probable cause.  See generally Gov't Opp'n. Instead, it insists that its use of the Pole Camera does not amount to a search.  Id. at 2.  Consequently, as the parties have presented this case, the use of the Pole Camera violates the Fourth Amendment if its operation constitutes a search. Although there are some exceptions -- none of which the Government invokes here[2] -- courts exclude evidence that federal

---

[2] For instance, the Government might have argued that the good faith exception to the exclusionary rule applies to its use of the Pole Cameras.  See Davis v. United States, 564 U.S. 229, 239 (2011) (holding that the exclusionary rule does not apply

officers obtain using a search that violates the Fourth

Amendment.  See United States v. Dedrick, 840 F. Supp. 2d 482,

492 (D. Mass. 2012) (citing Mapp v. Ohio, 367 U.S. 643 (1961)).

The Supreme Court has formulated two tests for analyzing

whether the Government has conducted a Fourth Amendment

"search."  See United States v. Bain, 874 F.3d 1, 11–12 (1st

Cir. 2017).  For one, "[u]nder the common law trespassory test,"

a Fourth Amendment search occurs "[w]hen the Government obtains

information by physically intruding on persons, houses, papers,

or effects."  Id. at 12 (quoting Florida v. Jardines, 569 U.S.

1, 5 (2013)).  In this case, neither Moore-Bush nor Moore assert

that a search occurred under the common law trespassory test.

See generally Moore-Bush Mot.; Moore Mot.

Instead, they rely on the "reasonable expectations test."

See id.; Bain, 874 F.3d at 12.  Under this test, "a search

occurs whenever the government intrudes upon any place in which

a person has a 'reasonable expectation of privacy.'"  Bain, 874

F.3d at 12 (quoting Katz v. United States, 389 U.S. 347, 360

---

"when the police conduct a search in objectively reasonable
reliance on binding judicial precedent").  It did not.
Accordingly, the Government did not carry its "'heavy burden' of
proving that the good-faith exception applies."  See United
States v. Wurie, 728 F.3d 1, 13 (1st Cir. 2013) (quoting United
States v. Syphers, 426 F.3d 461, 468 (1st Cir. 2005)), aff'd sub
nom. Riley v. California, 573 U.S. 373 (2014).  The Government
thereby waived that argument.  See United States v. Ramirez-
Rivera, 800 F.3d 1, 32 (1st Cir. 2015).

(1967) (Harlan, J., concurring)).  To show that a search occurred under this test, then, each defendant has the burden of showing that (1) she "exhibited an actual, subjective expectation of privacy" and (2) her "subjective expectation is one that society is prepared to recognize as objectively reasonable."  See United States v. Morel, 922 F.3d 1, 8 (1st Cir. 2019) (quoting United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009); United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016)).

Although the reasonable expectations test represents a relatively recent doctrinal innovation, the Supreme Court has taught that the public's understanding of unreasonable searches at the Fourth Amendment's framing informs the test's application.  See Carpenter v. United States, 138 S. Ct. 2206, 2214 (2018) (quoting Carroll v. United States, 267 U.S. 132, 149 (1925)).  The Supreme Court thus has identified two "basic guideposts" from history:  "First, that the [Fourth] Amendment seeks to secure 'the privacies of life' against 'arbitrary power.'  Second, and relatedly, that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'"  Id. (quoting Boyd v. United States, 116 U.S. 616, 630 (1886); United States v. Di Re, 332 U.S. 581, 595 (1948)).  These timeless guideposts point the Court on its way towards resolving this motion.

## IV.   ANALYSIS

The Court ALLOWS Moore-Bush and Moore's motion to suppress because they have exhibited an actual, subjective expectation of privacy that society recognizes as objectively reasonable.  See Morel, 922 F.3d at 8.  First, the Court infers from their choice of neighborhood that they subjectively expected that their and their houseguests' comings and goings over the course of eight months would not be surreptitiously surveilled.  See Moore Mot. 7.  Second, the Court rules that the Pole Cameras collected information that permitted the Government to peer into Moore-Bush and Moore's private lives and constitutionally protected associations in an objectively unreasonable manner.  See United States v. Jones, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring).

### A.   Subjective Expectation of Privacy

Moore-Bush and Moore have established that they had a subjective expectation of privacy in their and their guests' comings and goings from Moore's house.

As a preliminary matter, the Government suggests that, to establish this prong of the test, Moore-Bush and Moore needed to file affidavits or otherwise testify to their expectations.  See Gov't Opp'n 4 (citing United States v. Ruth, 65 F.3d 599, 604-05 (7th Cir. 1995)).  The First Circuit requires nothing of the sort:  In United States v. Rheault, the First Circuit rejected a

similar suggestion and instead inferred a subjective expectation of privacy from the defendant's actions.  561 F.3d at 59.  The Court thus analyzes whether Moore-Bush and Moore have manifested a subjective expectation of privacy through the relevant actions that they took.

Moore-Bush and Moore contend that they have established a subjective expectation of privacy by choosing to live in a quiet, residential neighborhood in a house obstructed by a large tree.  Moore Mot. 7.[3]  The Government maintains that this amounts to insufficient "conjecture" and "speculation."  Gov't Opp'n 4-5.  Further, the Government tries to turn Moore-Bush and Moore's tree argument around on them:  It insists that the tree "miminiz[ed] any potential intrusion."  Id. at 5.

The Government sidesteps Moore-Bush and Moore's asserted privacy interest:  it focuses on whether Moore-Bush and Moore had a broader privacy interest in the front of their house.  See Gov't Opp'n 4.  Construed broadly, perhaps they did not.  See

---

[3] The Court imputes Moore's expectations to Moore-Bush.  See Minnesota v. Olson, 495 U.S. 91, 99-100 (1990) (observing that "an adult daughter temporarily living in the home of her parents" has an expectation of privacy in her parents' home).  In opposing the motion, it seems that the Government does so, too.  See Gov't Opp'n 4 (stating "by pointing out just the tree, Defendants effectively acknowledge that there are no fences, shrubs, or other constructions that suggest that the inhabitants meant to shield the front of the house or driveway from public view" but then stating that "[t]he Defendant, however, uses the reference . . . to the solitary tree") (emphasis added).

California v. Ciraolo, 476 U.S. 207, 213 (1986) (observing that law enforcement officers need not "shield their eyes when passing by a home on public thoroughfares").

Yet that is not the narrower privacy interest that Moore-Bush and Moore assert here.  Instead, Moore-Bush and Moore claim that they expected privacy in the whole of their movements over the course of eight months from continuous video recording with magnification and logging features in the front of their house. Moore Mot. 9-10; Moore-Bush Mot. 5.  The Court infers from Moore-Bush and Moore's choice of neighborhood and home within it that they did not subjectively expect to be surreptitiously surveilled with meticulous precision each and every time they or a visitor came or went from their home.

Therefore, the Court rules that Moore-Bush and Moore meet the first prong of the reasonable expectations test.  See United States v. Childs, Crim. A. No. 06-10339-DPW, 2008 WL 941779, at *7 (D. Mass. Apr. 4, 2008) (Woodlock, J.) (inferring from "circumstantial evidence" that the defendant "had a subjective expectation of privacy").

### B.   Objectively Reasonable Expectation of Privacy

Moore-Bush and Moore's expectation of privacy "is one that society is prepared to recognize as objectively reasonable." See Morel, 922 F.3d at 8.

The First Circuit previously approved the use of a pole camera in United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir. 2009). Bucci, however, no longer binds this Court in light of subsequent Supreme Court precedent undermining it. See Carpenter, 138 S. Ct. at 2217-18. Consequently, this Court considers the issue as matter of first impression and rules that the surveillance conducted here exceeds the objectively reasonable expectation of privacy of the public at the time of the Fourth Amendment's framing. See id. at 2214.

### 1.   **Bucci Does Not Control**

Moore-Bush and Moore offer two reasons why Bucci ought not dictate the outcome here. First, they claim that Bucci's holding is limited to the camera that the Government used there, which had fewer capabilities than this Pole Camera. Moore-Bush Mot. 2-3; Moore Mot. 7. Second, they argue that Carpenter changed the law and requires a different result. Moore-Bush Mot. 3-6; Moore Mot. 8-12. The Court disagrees with Moore-Bush and Moore's first contention and agrees with their second.

True, the First Circuit noted some factual distinctions between the camera in Bucci and the Pole Camera here. Although the camera in Bucci pointed at the front of a house for eight months, law enforcement officers lacked the capability to control the camera remotely "without being physically at the

scene."[4]   582 F.3d at 116.   That distinction is too thin to distinguish Bucci from this case, however, especially in light of the legal rules that the First Circuit applied.   In Bucci, the First Circuit reasoned that the "legal principle" that "[a]n individual does not have an expectation of privacy in items or places he exposes to the public" disposed of the matter.   Id. at 116-17 (citing Katz, 389 U.S. at 351).   If that principle remains an accurate depiction of the law, Moore and Moore-Bush lack an objectively reasonable expectation of privacy in the activities just outside their home, regardless of the camera's unique capabilities.

The Court reads Carpenter, however, to cabin -- if not repudiate -- that principle.   There, the Supreme Court stated that:   "A person does not surrender all Fourth Amendment protection by venturing into the public sphere.   To the contrary, 'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.'"   Carpenter, 138 S. Ct. at 2217 (quoting Katz, 389 U.S. at 351-52).   What's more, the Supreme Court recognized that long-term tracking of a person's movements "provides an intimate window into a person's life, revealing not only his particular

---

[4] It is unclear whether the law enforcement officers in Bucci could pan or zoom that camera when physically at the scene.   582 F.3d at 116.

movements, but through them his 'familial, political, professional, religious, and sexual associations.'" Id. (quoting Jones, 565 U.S. at 415 (Sotomayor, J., concurring)); see also United States v. Garcia-Gonzalez, Crim. A. No. 14-10296-LTS, 2015 WL 5145537, at *9 (D. Mass. Sept. 1, 2015) (Sorokin, J.) (observing that Justices Alito and Sotomayor's concurrences in Jones "undermine Bucci's legal [and] analytic foundations").  Additionally, the Supreme Court distinguished the tracking involved in Carpenter from historical surveillance methods on the ground that the tracking produced a log that law enforcement officers could use to "travel back in time to retrace a person's whereabouts" whereas "a dearth of records and the frailties of recollection" limited surveillance in the past. 138 S. Ct. at 2218.

The Government protests that the Supreme Court characterized its holding in Carpenter as "narrow" and thus limited to the technology addressed in that case, cell-site location information.  Gov't Opp'n 6 (quoting Carpenter, 138 S. Ct. at 2217, 2219).  The Court, however, does not ground its decision on Carpenter's holding but instead on its necessary reasoning; that is, a person does have some objectively reasonable expectations of privacy when in spaces visible to the public.  See 138 S. Ct. at 2217.  The Court cannot reconcile

that reasoning with Bucci's blanket statement that no such

expectations exist.  See 582 F.3d at 117.[5]

The Government also brings to this Court's attention two

out-of-circuit district courts' rejections of post-Carpenter

challenges to pole cameras.  Gov't Opp'n 6 (citing United States

v. Kay, No. 17-CR-16, 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018);

United States v. Kubasiak, No. 18-CR-120, 2018 WL 6164346 (E.D.

Wis. Aug. 23, 2018), report and recommendation adopted 2018 WL

4846761 (Oct. 5, 2018)).  Nevertheless, in each of those

cases -- and the two others that this Court located -- the

district courts premised their approval of the pole cameras in

large part on the claim that those cameras were "security

cameras."  See Kubasiak, 2018 WL 6164346, at *4 (basing its

reasoning on the Supreme Court's emphasis in Carpenter that it

did not "call into question conventional surveillance techniques

---

[5] One possible route to reconcile the First Circuit's
pronouncement in Bucci with the Supreme Court's reasoning in
Carpenter would be to distinguish between real-time observations
of the front of a house and a video log recording them.  See
Carpenter, 138 S. Ct. at 2217; Bucci, 582 F.3d at 116-17.  The
First Circuit, however, did not specify whether law enforcement
officers monitored the camera used in Bucci contemporaneously or
reviewed digitized recordings afterwards.  See Bucci, 582 F.3d
at 116-17.  The Court explains in section IV.B.2 why, at least,
the latter scenario sparks severe Fourth -- and First --
Amendment concerns.  The Court therefore reads Carpenter to
overrule Bucci to the extent that Bucci sanctioned constant law
enforcement video logging of activities outside a home for eight
months.  See Carpenter, 138 S. Ct. at 2217; Bucci, 582 F.3d at
116-17.

and tools, such as security cameras" (quoting 138 S. Ct. at 2220)); Kay, 2018 WL 3995902, at *2 (same); United States v. Tirado, No. 16-CR-168, 2018 WL 3995901, at *2 (E.D. Wis. Aug. 21, 2018) (same); United States v. Tuggle, No. 16-CR-20070-JES-JEH, 2018 WL 3631881, at *3 (C.D. Ill. July 31, 2018) (same).

This Pole Camera is not a security camera by any stretch of the imagination.  As relevant here, Merriam-Webster defines security as "something that secures . . . measures taken to guard against espionage or sabotage, crime, attack, or escape." Security, Merriam-Webster, https://www.merriam-webster.com/dictionary/security (last accessed May 15, 2019); see also Security, Black's Law Dictionary (10th ed. 2014) ("The quality, state, or condition of being secure, esp. from danger or attack.").  Law enforcement officers did not install the Pole Camera here "to guard against . . . crime," but to investigate suspects. Indeed, the prototypical security camera exists to monitor a heavily trafficked area or commercial establishment.  Security camera operators often install their cameras in plain view or with warning signs to deter wrongdoers.  See, e.g., Commonwealth v. Rivera, 445 Mass. 119, 133-34 (2005) (Cowin, J.) (observing, in a different context, that the defendant should have expected that a "standard security surveillance camera mounted by the store owner in plain view" would record him).  The Government hid the Pole Camera out of sight of its targets and does not

suggest that it did so to prevent criminal activity.  Instead, the Government explained that it used the Pole Camera simply to track suspects' travels, which, standing alone, were not crimes. <u>See</u> Defs.' Exs. Pretrial Mots., Ex. 2 at 132 (describing the installation of Pole Camera and explaining that it "proved to be useful in identifying several vehicles visiting" Moore-Bush, "confirm[ing] when MOORE-BUSH [was] in the Springfield area," and "identifying rental vehicles used by MOORE-BUSH").[6] Accordingly, though <u>Carpenter</u> does not discuss pole cameras, its logic contradicts <u>Bucci</u>'s and requires this Court to examine whether the Government's use of the Pole Camera constitutes a search.

> **2.    The Use of the Pole Camera Invaded Moore-Bush and Moore's Objectively Reasonable Expectations of Privacy**

In light of the principles that the Supreme Court elucidated in <u>Carpenter</u>, this Court holds that Moore-Bush and Moore had an objectively reasonable expectation of privacy in their and their guests' activities around the front of the house for a continuous eight-month period.  <u>See</u> 138 S. Ct. at 2213-14, 2217-18.

In <u>Garcia-Gonzalez</u>, Judge Sorokin came close to suppressing video from a pole camera similar to the one here on the basis of

---

[6] Moore-Bush and Moore manually filed their exhibits, so the exhibits do not appear on the electronic court filing system.

Jones but ultimately pulled back.   2015 WL 5145537, at *9.

Jones addressed whether the Government could surreptitiously

attach a location tracking device to a car.   565 U.S. at 402.

Although the opinion of the Court invalidated the tracking under

the common law trespassory test, Justices Alito and Sotomayor

filed concurrences that applied the reasonable expectations

test, which, combined, obtained the support of a majority of the

justices.   565 U.S. at 413-31.   Judge Sorokin noted this

apparent Supreme Court majority and observed that extended pole

camera surveillance raised more serious concerns than the

location tracking in Jones:

> [T]he two concurrences in Jones, emphasized that
> "longer term GPS monitoring in investigations of most
> offenses impinges on expectations of privacy."  Justice
> Sotomayor remarked that "GPS monitoring generates a
> precise, comprehensive record of a person's public
> movements that reflects a wealth of detail about her
> familial, political, professional, religious, and sexual
> associates." . . . GPS data provides only the "where"
> and "how long" of a person's public movements insofar as
> the person remains close to the monitored vehicle.  Long-
> term around-the-clock monitoring of a residence
> chronicles and informs the "who, what, when, why, where
> from, and how long" of a person's activities and
> associations unfolding at the threshold adjoining one's
> private and public lives.

Garcia-Gonzalez, 2015 WL 5145537, at *8 (quoting Jones, 565 U.S.

at 414 (Sotomayor, J., concurring)).   Nevertheless, Judge

Sorokin viewed himself bound to apply Bucci's reasoning because

neither Justice Alito nor Justice Sotomayor spoke for the

Supreme Court in Jones.  Garcia-Gonzalez, 2015 WL 5145537, at
*9.

The Supreme Court's Carpenter decision, however,
incorporates the Jones concurrences.  See, e.g., Carpenter, 138
S. Ct. at 2215 (quoting with approval Justices Alito and
Sotomayor's conclusion that "'longer term GPS monitoring in
investigations of most offenses impinges on expectations of
privacy' -- regardless whether those movements were disclosed to
the public at large"); id. at 2217 (quoting Justice Alito's
concurrence stating that "[p]rior to the digital age, law
enforcement officers might have pursued a suspect for a brief
stretch, but doing so 'for any extended period of time was
difficult and costly and therefore rarely undertaken'"); id. at
2220 (citing Justices Alito and Sotomayor's Jones concurrences
that a search occurs when the Government subjects a vehicle to
"pervasive tracking" on public roads).  As a consequence, this
Court interprets Carpenter to apply the Jones concurrences.
This Court thus applies the principles from Carpenter and the
Jones concurrences to the Pole Camera here.

In the Court's view, three principles from the Jones
concurrences and Carpenter dictate the resolution of this
motion.  First, as Justice Sotomayor points out in Jones,
"[a]wareness that the Government may be watching chills
associational and expressive freedoms.  And the Government's

unrestrained power to assemble data that reveal private aspects

of identity is susceptible to abuse." 565 U.S. at 416.[7] Second,

as Chief Justice Roberts observes in Carpenter, technologies

that permit law enforcement officers to access and search vast

amounts of passively collected data may "give police access to a

---

[7] The Supreme Court has long instructed magistrates to consider First Amendment values in analyzing whether a warrant's proposed search is reasonable. See Zurcher v. Stanford Daily, 436 U.S. 547, 564 (1978) (in "determining the reasonableness of a search, state and federal magistrates should be aware that 'unrestricted power of search and seizure could also be an instrument for stifling liberty of expression.'" (quoting Marcus v. Search Warrant, 367 U.S. 717, 729 (1961))). The Fourth Amendment's framers recalled the use of general warrants that the King used to harass and persecute Catholic and Puritan publishers. Stanford v. Texas, 379 U.S. 476, 482 (1965). A line of cases establishes that when a magistrate analyzes a warrant application for expressive material, as opposed to physical contraband such as "weapons or drugs," the magistrate must review the application "with 'scrupulous exactitude.'" New York v. P.J. Video, Inc., 475 U.S. 868, 871 (1986) (quoting Stanford, 379 U.S. at 481-85).

As far as this Court can tell, Jones and Carpenter represent the first cases in which the Supreme Court instructed courts to consider First Amendment values in deciding whether a search occurred at all. See United States v. Sparks, 750 F. Supp. 2d 384, 387 n.5 (D. Mass. 2010) (pre-Jones, rejecting the defendant's arguments that "evidence must be excluded because the government violated his First Amendment right to free association"). Indeed, in Katz, Justice Stewart's opinion for the Supreme Court -- upon which courts seldom now rely in favor of Justice Harlan's concurrence -- takes pains to differentiate the spheres of protection provided by the First and Fourth Amendments. 389 U.S. at 350-51 & n.5. The Court views the addition of First Amendment principles to the Katz reasonable expectations test as a welcome development in Fourth Amendment law. See Rachel Levinson-Waldman, Hiding in Plain Sight: A Fourth Amendment Framework for Analyzing Government Surveillance in Public, 66 Emory L.J. 527, 552, 557 (2017); Daniel J. Solove, The First Amendment As Criminal Procedure, 82 N.Y.U. L. Rev. 112, 127-28 (2007).

category of information otherwise unknowable." See 138 S. Ct.
at 2218.  Third, as Justice Alito reasons in Jones, "relatively
short-term monitoring of a person's movements on public streets
accords with expectations of privacy that our society has
recognized as reasonable.  But the use of longer-term GPS
monitoring in investigations of most offenses impinges on
expectations of privacy."  565 U.S. at 430 (citing United States
v. Knotts, 460 U.S. 276, 281-82 (1983)).

The surveillance here risks chilling core First Amendment
activities.  Consider religious dissenters.  Surely the public
at the time of the Fourth Amendment's framing would be familiar
with the dissenting religious groups that objected to the Church
of England's practices, such as the Methodists, Pilgrims,
Puritans, and Quakers.  After Parliament enacted the Act of
Uniformity, which compelled all Englishmen to attend Church of
England services and criminalized "conduct[ing] or attend[ing]
religious gatherings of any other kind," religious dissenters
continued to hold their worship gatherings in secret.  See Engel
v. Vitale, 370 U.S. 421, 432-33 (1962).  Many of those
gatherings took place in private homes to avoid prosecution --
often unsuccessfully.  See id.; John C. English, John Wesley and
the Rights of Conscience, 37 J. Church & St. 349, 350, 360
(1995) (noting that early Methodist ministers preached in
private houses notwithstanding the risk that magistrates would

fine them for violating the Conventicle Act); see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 530-31 (1993) (striking down city ordinance outlawing religious practice that took place in secret); Congregation Jeshuat Israel v. Congregation Shearith Israel, 186 F. Supp. 3d 158, 169 (D.R.I. 2016) (recounting that the first Jewish families to emigrate to the colonies "met to worship at private dwelling houses"), rev'd, 866 F.3d 53 (1st Cir. 2017) (not disturbing this finding of fact).  It stands to reason that the public at the time of the amendment's framing would have understood the King's constables to violate their understanding of privacy if they discovered that constables had managed to collect a detailed log of when a home's occupants were inside and when visitors arrived and whom they were.

What's more, people use their homes for all sorts of liaisons.  For example, the Government has no business knowing that someone other than the occupant's spouse visited the home late at night when the spouse was away and left early in the morning.  See Lawrence v. Texas, 539 U.S. 558, 574 (2003) (reconfirming that "our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education" (citing Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851 (1992)).  Nor does the Government have

any business tracking a homeowners' hobbies or regular trips for appointments.  Perhaps people would hesitate to have supporters of opposition political parties visit if they knew that the Government might be monitoring their driveway.  The continuous video taken by the Pole Camera thus threatens to chill these religious, political, and associational activities.  See U.S. Const. amend. I; Jones, 565 U.S. at 416 (Sotomayor, J., concurring) ("Awareness that the Government may be watching chills associational and expressive freedoms.").

Moreover, the video from the Pole Camera was not only continuous, but also recorded and digitized.  Thus, even if the Government were to show no contemporaneous interest in these intimate personal details, the Government can go back on a whim and determine a home occupant's routines with to-the-second specificity.  See Carpenter, 138 S. Ct. at 2218.  This capability distinguishes this surveillance from human surveillance.  Humans are imperfect note-takers and not all blessed with photographic memory.  See id.  The Pole Camera, however, captured every single second that passed over eight months in a digitally searchable form.  Information that a law enforcement officer might have ignored at the time as irrelevant to the investigation or mis-recorded no longer prevents the Government's prying eyes from wandering.  See id.  This power also sets the Pole Camera apart from neighbors; even -- or

perhaps especially -- on a residential street, neighbors notice each other's peculiar habits.  Yet they would not notice all of their neighbors' habits, especially those activities occurring during traditional working hours or in the dark.

While Jones involved a car on a public road, Justice Alito's conclusion that society reasonably expects to be free from long-term surveillance in public applies with equal force to society's reasonable expectations about the public space in front of a person's home.  See 565 U.S. at 430.  Indeed, Fourth Amendment doctrine treats the home with due reverence.  "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  Kyllo v. United States, 533 U.S. 27, 31 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).  Here, for eight months, the Government monitored every single time that Moore-Bush and Moore retreated into their home, thereby impairing their freedom to retreat as they pleased.

While the Government neither trespassed onto Moore's home's curtilage nor peeked inside her home, the Court is sensitive to the different expectations people reasonably may have about activities on their driveway and near their front door.  Cf. Jardines, 569 U.S. at 7-9 (applying the common law trespassory test to a home's curtilage, limiting the "implicit license" permitting visitors to approach a home's front door).  Although

these activities, taken one by one, may not give rise to a reasonable expectation of privacy, as on the public roads, the Court aggregates their sum total for its analysis.  In Jones, a majority of justices reasoned that law enforcement officers conducted a search when they surveilled a car for four weeks. 565 U.S. at 413-14 (Sotomayor, J., concurring).  Here, law enforcement officers surveilled the home for eight months.  A home occupant would not reasonably expect that.  While the law does not "require law enforcement officers to shield their eyes when passing by a home on public thoroughfares," Ciraolo, 476 U.S. at 213 (emphasis added), it does forbid the intrusive, constant surveillance here.

The Government counters that it has long used pole camera technology to surveil suspects at home.  This Pole Camera, however, is unique in this Court's experience.  As discussed above, this Pole Camera did not require monitoring in real time because the Pole Camera created a digitally searchable log.  The Government provides no evidence that pole cameras have long had this capability.  Moreover, the Court observes that in three of the four post-Carpenter cases and in Bucci the Government could not magnify images without traveling to the scene.  See Kay, 2018 WL 3995902, at *2; Tirado, 2018 WL 3995901, at *2; Tuggle, 2018 WL 3631881, at *3; Bucci, 582 F.3d at 116.  Law enforcement officers could also pan and tilt this camera.  The ability to

take all these action from afar, potentially using a cellphone
or tablet computer, seems to be a new development.  <u>Compare</u>
Gov't Opp'n 3 & n.1 <u>with</u> Moore Mot. 6.

Therefore, the Court holds that the Pole Camera, as used
here, does not constitute a "conventional security technique[.]"
<u>Carpenter</u>, 138 S. Ct. at 2220.  Accordingly, Moore-Bush and
Moore meet the second prong of the reasonable expectations test.[8]

## V.   CONCLUSION

In sum, this Court does not rule that the use of a pole
camera necessarily constitutes a search.  Instead, the Court
rules narrowly that several aspects of the Government's use of
this Pole Camera does.  Those aspects are the Pole Camera's (1)

---

[8] While beyond the record here, it is worth noting that
"[p]olice surveillance equipment (including both dashboard
cameras and body cameras) has become both cheaper and more
effective . . . ."  <u>United States</u> v. <u>Paxton</u>, 848 F.3d 803, 812
(7th Cir. 2017); <u>see also</u> Farhad Manjoo, <u>San Francisco Is Right:</u>
<u>Facial Recognition Must Be Put On Hold</u>, N.Y. Times (May 16,
2019), https://www.nytimes.com/2019/05/16/opinion/columnists/fac
ial-recognition-ban-privacy.html (noting, among other things,
that cameras "keep getting cheaper and -- in ways both amazing
and alarming -- they are getting smarter"); <u>Jones</u>, 565 U.S. at
415-16 (Sotomayor, J., concurring) (observing that "because GPS
monitoring is cheap in comparison to conventional surveillance
techniques and, by design, proceeds surreptitiously, it evades
the ordinary checks that constrain abusive law enforcement
practices: "limited police resources and community hostility."
(quoting <u>Illinois</u> v. <u>Lidster</u>, 540 U.S. 419, 426 (2004)).
Although this Court's decision does not rely on this trend, it
appears beyond serious debate that the costs of pole camera
surveillance have shrunk significantly, thereby tilting any
cost-benefit calculation that the Government might perform in
favor of using that technique.

continuous video recording for approximately eight months; (2)
focus on the driveway and front of the house; (3) ability to
zoom in so close that it can read license plate numbers; and (4)
creation of a digitally searchable log.  Taken together, these
features permit the Government to piece together intimate
details of a suspect's life.  See Carpenter, 138 S. Ct. at 2217
(quoting Jones, 565 U.S. at 415 (Sotomayor, J., concurring)).

Therefore, the Court ALLOWS Moore-Bush and Moore's motions
to suppress evidence obtained directly from the Pole Camera, ECF
Nos. 326, 358.  Although Moore-Bush and Moore say that the Pole
Camera may have led to the discovery of other tainted evidence,
they do not identify that evidence for the Court.  The Court
thus takes no action with regard to evidence collected
indirectly from the Pole Camera.[9]

SO ORDERED.

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[9] A preliminary review of the record before this Court
indicates that the independent source exception may preclude
suppression of any other evidence.  See United States v. Flores,
888 F.3d 537, 546 (1st Cir. 2018) (providing that a court ought
not suppress evidence when the Government decided to obtain a
warrant "independent" of constitutional violations and if the
warrant, excised of knowledge obtained from those violations,
otherwise establishes probable cause) (citing United States v.
Murray, 487 U.S. 533, 542 (1988); United States v. Dessesaure,
429 F.3d 359, 367 (1st Cir. 2005)).