1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS (Springfield)

3                              No. 3:18-cr-30001-WGY

4

5

6    UNITED STATES OF AMERICA

7    vs.

8

9    NIA MOORE-BUSH

10

11

12                          * * * * * * * * *

13

14                       For Hearing Before:
                         Judge William G. Young

15

16                          Detention Hearing

17

18                       United States District Court
                         District of Massachusetts (Boston)
                         One Courthouse Way

19                       Boston, Massachusetts 02210
                         Tuesday, March 3, 2020

20

21                          * * * * * * * *

22

23            REPORTER: RICHARD H. ROMANOW, RPR
                         Official Court Reporter
                         United States District Court

24      One Courthouse Way, Room 5510, Boston, MA 02210
                         bulldog@richromanow.com

25

```
1                    A P P E A R A N C E S

2

3   AMY H. BURKART, ESQ.
        United States Attorney's Office
4       J. Joseph Moakley U.S. Courthouse
        1 Courthouse Way, Suite 9200
5       Boston, Massachusetts 02210
        (617) 748-3100
6       Email: Amy.burkart@usdoj.gov
        For the United States
7

8

9   JOSHUA ROBERT HANYE, ESQ.
        Federal Public Defender's Office
10      51 Sleeper Street, 5th Floor
        Boston, Massachusetts 02210
11      (617) 223-8061
        Email: Joshua_hanye@fd.org
12      For the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

4

5   RONALD LaVONTE

6     By Mr. Hanye:            16

7     By Ms. Burkart:                  39

8

9

10

11                     E X H I B I T S

12

13

       EXHIBIT 1..................... 23
14
       EXHIBIT 2..................... 36
15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          (Begins, 10:00 a.m.)

3          THE CLERK:  Now hearing Criminal Matter 18-30001,

4    the United States of America versus Nia Moore-Bush.

5          THE COURT:  Good morning.  Would counsel please

6    identify themselves.

7          MS. BURKART:  Good morning, your Honor, Amy

8    Burkart for the United States.

9          MR. HANYE:  Josh Hanye for Nia Moore-Bush.  Good

10   morning, your Honor.  And with me is Abby Penvia, who's

11   a paralegal who's been working on Ms. Moore-Bush's case.

12   So with the Court's permission, I'd ask that she be able

13   to sit with me at counsel table.

14         THE COURT:  Of course she may.

15         MR. HANYE:  Thank you, your Honor.

16         THE COURT:  Let me start, Mr. Hanye, with you, and

17   I'm not going to -- but I'm going to jump over, I guess,

18   the substance here, which I'll give careful

19   consideration to.

20         Suppose I thought that I ought, um, revise the

21   conditions of pretrial restriction, what's your plan?

22         MR. HANYE:  We're proposing that she be released

23   on home detention to her grandmother's home.  And her

24   grandmother is planning on being here, although I don't

25   see her in the courtroom yet.

1          Probation has conducted, I believe, two different

2     visits to the home, and although probation continues to

3     recommend detention, there are no concerns with the home

4     as a place to live.  So what we're proposing to do is

5     she be on full-time home detention, the only time she

6     can leave the home is for approved medical visits, and

7     that it be monitored by electronic ankle bracelets.  And

8     in addition, I propose her grandmother as a third-party

9     custodian, um, who could be another eyes and ears of the

10    probation department in the home with Ms. Moore-Bush.

11         One of the issues that you will hear, um, in the

12    testimony, if we are able to go forward, is that there's

13    concerns from the Wyatt medical staff that Ms. Moore-

14    Bush's diet plays a role here.  Well having a third-

15    party custodian, her grandmother, is a way to enforce,

16    make sure, and assist her in maintaining her diet.  So

17    if she's home, if she's locked down, if she's got a

18    third-party custodian, that mitigates any potential

19    concerns about risk of flight or danger to the

20    community.  And what she would be allowed to do, what

21    she would have access to do, would be to address her

22    serious medical condition, which specifically is what's

23    been described to me as dangerously high hemoglobin

24    levels.

25         She would have access to change her insulin, to go

1    back to what she's previously received, not the form

2    she's receiving at Wyatt now.  She could get an insulin

3    pump as opposed to the injections which I think she's

4    getting three times a day right now.  She would have

5    access to regular exercise, because her grandmother has

6    a treadmill, and exercise is an important part of trying

7    to manage her diabetes.  She would have access to better

8    food.  And she would have access to her own doctors,

9    including the endocrinologist who she was seeing while

10   she was previously held at the Hampton facility while

11   the case was still in Springfield.

12        So those are all the reasons that would allow her

13   to control her diabetes, which is out of control right

14   now, and the home detention and the third-party

15   custodian would mitigate any risk of flight or danger to

16   the community effectively.

17        THE COURT:  Thank you.

18        And, Ms. Burkart, as a practical matter, what

19   makes this case difficult is that, um, for perfectly

20   appropriate reasons, I have no control over it, but the

21   case is before the Court of Appeals.  I don't mean that

22   critically of another court, that's the care with which

23   our justice system operates.  But I can't, for instance,

24   accelerate the trial or -- well you understand the

25   situation I'm in.  That's why I'm sympathetic to this.

1    Now thank you for calling to my attention your

2    order you filed, which is very helpful, because nothing

3    really has changed other than, um, maybe nuanced data

4    that I can get from the doctors.

5    But let's -- recognizing that practicality, what's

6    the matter with that, a person who is innocent, being

7    held to respond to very serious charges?

8    MS. BURKART:   Your Honor, I think there's a few

9    things of concern here.   One is -- as you saw in the

10   outline that I provided in the file sealing, to refresh

11   the Court's recollection, and frankly to educate myself,

12   because I was not on the case at that point, but in

13   going through the docket and in looking at that sealed

14   filing, I was reminded of something that I had learned

15   when I was joining the case, which is that the subject

16   of Ms. Moore-Bush's detention was a heavily-litigated

17   heavily-discussed matter many times, and as your Honor

18   said, the medical situation has not changed as a

19   procedural matter.   In substance there are certainly,

20   you know, additional allegations that your Honor wants

21   to explore, but I think there's a reason under 18 USC

22   3142(f) that we don't reopen detention decisions

23   lightly, that there are standards that need to be met,

24   and that the defense has the burden to show that there's

25   something that hasn't been considered in some new

1    information.

2         THE COURT:  I agree with that, and that's why I

3    started as I did.  All that's true.  I'm familiar with

4    the record.  I'm not accustomed to holding these

5    hearings.  What makes it different for me is the

6    pendency of the appeal.

7    Now however the appeal comes out -- again just talking

8    practically, this case is not going away.  Let's say

9    this court is affirmed.  Some of the government's

10   evidence goes away, but my recollection as to the record

11   is there's substantial evidence even so.

12   If the court -- if this court is reversed, we're ready

13   to go -- or I take it you're ready to go, in a very

14   short period of time, as am I.  And it's that fact that

15   we all necessarily and properly must wait on the

16   considered decision of the Court of Appeals -- and I'm

17   being very transparent, that's caused me to hold this

18   hearing.

19        MS. BURKART:  I understand, your Honor.  I think

20   to that point there's a couple of important things for

21   us all to keep in mind.

22        One is that Ms. Moore-Bush had indicated her

23   interest in pleading guilty in this case, we were on for

24   a Rule 11, um, that had changed because there was a

25   conflict that arose at her household that her counsel

1  had not been previously aware of.  In the interim there

2  was a decision that has, um, you know very

3  understandably caused Mr. Hanye to think it's probably

4  not the right time to move forward with that plea, um,

5  and that's understandable.  But as to Ms. Moore-Bush,

6  the evidence is very strong regardless of the appeal of

7  her decision.

8          THE COURT:  I don't doubt it.

9          MS. BURKART:  And it's important because one of

10  the underlying decisions that a magistrate court judge

11  looks at when considering dangerousness and risk of

12  flight is the strength of the evidence, and as to

13  Ms. Moore-Bush, there is a significant amount of

14  evidence that derives not only from the pole cam, nor

15  from the fruits of that evidence.  So there's a 10-year

16  mandatory minimum in this case, significant indications

17  of dangerousness.  And one of the key factors that the

18  lower court considers, um, when they were deciding to

19  hold Ms. Moore-Bush, um, pending trial in the first

20  place, was the fact that she continued to run a gun and

21  drug trafficking organization well on pretrial release

22  or well on release from a state court.  So that factor

23  remains.

24          The only thing that has changed is that there has

25  been some uncertainty entered into the timeline, in this

```
 1   case because of the Court of Appeals decision, but
 2   that's not uncommon, your Honor, with the subject's
 3   health, um, pending another thing happening in court --
 4   to be happening with a co-defendant, that some other
 5   types of uncertainties arise, and it doesn't
 6   fundamentally change the fact that she's facing a
 7   10-year mandatory minimum sentence with very strong
 8   evidence, strong indications of dangerousness, and risk
 9   of flight.  And to open all of that up again because she
10   has essentially sabotaged her own medical condition
11   in --
12          THE COURT:  Why is that?
13          MS. BURKART:  Pardon?
14          THE COURT:  Why has she "self-sabotaged her
15   medical condition"?
16          MS. BURKART:  The indications in the record are
17   that Ms. Moore-Bush's condition, which is admittedly
18   Serious -- diabetes is a serious condition, but that
19   they have been made worse by the fact that she fails to
20   comply with her doctor's orders.  There are many
21   indications in the record -- it's actually covered in
22   the government's motion in 2018 and remains true today
23   that Ms. Moore-Bush, of being very manipulative with
24   those around her.  And obviously with the Court she
25   engaged in a money-laundering fraud scheme, so there's
```

1    indications just in the charges of her manipulative

2    behavior.  But specifically with regard to her medical

3    condition, there are indications of her engaging in

4    manipulative behavior and self-sabotaging by not eating

5    food and following her doctor's orders.  When she was

6    released her condition was quite serious and she was

7    also not following her doctor's orders.

8         So we're not dealing with a patient here who was,

9    you know while she was out she was healthy, she was

10   following the recommendations of her doctors, and now

11   that she's been incarcerated, something has changed.

12   When Ms. Moore-Bush was first incarcerated, her health

13   conditions significantly improved because she began to

14   have 24-hour supervision.  She had been in quite dire

15   straits before her incarceration, as I understand it,

16   because she failed to follow her doctor's orders.  And

17   that pattern and practice of not following her doctor's

18   recommendations with regard to eating and exercise are

19   what is putting her health at risk.

20        So I think that it raises a very dangerous

21   incentive for patients who have conditions which require

22   them to engage in some self-control or self-care to,

23   while incarcerated, make their condition bad enough that

24   they then have an argument for relief.

25        I also note, your Honor, that the doctor's e-mails

1    that raised real concerns here were not -- were

2    indicating that very same concern, but it's Ms. Moore-

3    Bush's behavior that is putting her in medical jeopardy.

4    And even the sentence, the most alarming sentence where,

5    um, the doctor says, you know, she faces serious health

6    complications -- ketoacidosis, which is one of the most

7    significant, um, conditions that can happen when someone

8    has diabetes, and renal failure, again a very common and

9    serious, um, concern for diabetics, is something that

10   her continued behavior would put her at risk of.

11        So that concerns me as well when Mr. Hanye

12   proposes conditions that might, for a different patient,

13   be quite accurate, that being at home will allow them to

14   take better medical care, but the doctors here were

15   suggesting why it wasn't appropriate, that because she

16   needed a higher level of medical care, they were talking

17   about whether they should consider an infirmary

18   situation.  And so releasing someone who the doctors

19   have said even 24-hour supervision is something that

20   we're questioning rights now, because we're thinking we

21   might need to put her in an infirmary or more of a

22   hospital-like setting, releasing that person that is

23   showing this behavior into the home of their grandmother

24   is a significant concern, it raises questions, as I

25   said, about the incentives for those kinds of patients,

1    it raises questions about what will happen with her

2    health when she does do that.  And if that's the basis

3    for this argument, that she's being released for her

4    health, um, there's no indication her health will

5    improve when released to the community.

6         It's also incredibly significant, your Honor, that

7    Ms. Moore-Bush ran a large-scale drug and gun

8    trafficking organization while living with her mother,

9    who is, as you may remember, a Clerk Magistrate.  And so

10   in her mother's home --

11        THE COURT:  I have all the records in the case.

12        MS. BURKART:  No doubt, your Honor.

13        But I think when you're talking about a defendant

14   being able to be cared for and monitored by their

15   grandmother and that being a factor that the defense

16   asks the Court to consider in saying that she'll be

17   appropriately monitored and that the grandmother will

18   serve as an arm of probation, um, remember she was

19   living with her own mother while running a drug and gun

20   trafficking organization in her house.

21        And so I think given those facts and

22   circumstances, your Honor, having a full-scale detention

23   hearing under these circumstances, I would ask for

24   additional time to prepare the type of information that

25   your Honor would need to hear about dangerousness, risk

1    of flight, and all of the other things that go into a

2    full-scale detention hearing.  But I would argue, your

3    Honor, that there's no reason to have that here today

4    because the preliminary burden of deciding whether to

5    reopen that issue of detention hasn't been met because

6    there is not new information that would undermine the

7    repeated findings of other courts considering the same

8    issue.  She has a serious diabetic condition, she needs

9    to treat seriously and properly, and frankly it's

10   premature to say that Wyatt can't handle that.

11        If you Honor felt that we needed to look at

12   additional options, the marshal service has a number of

13   different resources at its disposal, but an answer

14   cannot be "We have a patient who is incarcerated and

15   they have medical conditions that require more

16   significant treatment, so we're going to release them."

17        THE COURT:  All right, that's -- let me go step by

18   step.

19        I've considered the arguments of counsel and the

20   situation that the Court finds itself in -- let's be

21   clear, I am going to reopen it.  So I've taken that

22   step.  Now Mr. Hanye, who bears the burden of proof, has

23   apparently got some witnesses here and I'm prepared to

24   hear from them briefly.  You want some more time,

25   Ms. Burkart, and I think that that makes sense.

1    So, Mr. Hanye, I have a matter at 11:00 and I

2    intend to keep that schedule.  So does it make sense --

3    you brought people here and I appreciate that, to hear

4    from them now, or shall I set another date where I can

5    give more time?

6        MR. HANYE:  Well they made a three-hour trip, so I

7    think it makes sense to hear from them now.  There are

8    two witnesses present, one is the health services

9    administrator, who is the one who sent the initial

10   request to the marshals for a transfer, Ron LaVonte,

11   your Honor, and I would start with him.  There's a

12   doctor here as well, and I'm not planning on calling the

13   doctor at this point, but I would ask that he be

14   sequestered -- I don't know if the government would want

15   to call him or I may want to call him.

16       THE COURT:  All right, he may be sequestered and

17   you may proceed.  Let me talk with the Clerk so you're

18   aware of the Court's schedule.

19       (Pause.)

20       THE COURT:  We're going to start, but here's how

21   my schedule looks.  Tomorrow I could start at 10:00,

22   Thursday I could start at 9:00.  I want to make myself

23   available to you, so it doesn't have to be tomorrow,

24   since those two days are available.  Let's get as far as

25   we can get and then I will hear from you as to how you

1   think we ought to proceed.

2          Mr. Hanye, you may call your first witness.

3          MR. HANYE:  Your Honor, may I speak to the

4   witnesses for one moment, I believe there might be an

5   additional report that was coming.

6          THE COURT:  Yes, you may.

7          (Pause.)

8          MR. HANYE:  Your Honor, Ms. Moore-Bush calls Ron

9   LaVonte.

10          THE COURT:  He may be called.

11          (RONALD LaVONTE, sworn.)

12

13          * * * * * * * * * * * * * *

14          RONALD LaVONTE

15          * * * * * * * * * * * * * *

16

17   DIRECT EXAMINATION BY MR. HANYE:

18   Q.    Good morning, sir.

19   A.    Good morning.

20   Q.    Could you please state your name and spell it for

21   the record.

22   A.    Ronald LaVonte, L-A-V-O-N-T-E.

23   Q.    And, Mr. LaVonte, where do you work?

24   A.    Wyatt detention facility.

25   Q.    What is your position?

1    A.     Health Services Administrator.

2    Q.     And what are your responsibilities as the Health

3    Service Administrator?

4    A.     I am the responsible health authority for all the

5    provisions of health care within Wyatt.

6    Q.     How long have you held that position?

7    A.     6 months.

8    Q.     Have you had similar positions in the past?

9    A.     Yes, I was the Health Services Administrator in

10   Connecticut for 21 years.

11   Q.     For the entire state of Connecticut?

12   A.     Oh, no, different facilities.  I'm a subject

13   matter expert in the incarcerated female, I work mostly

14   at the York Correctional Facility in Niantic,

15   Connecticut.

16   Q.     And, um, can you summarize the training and

17   education that qualifies you for your current position?

18   A.     So, um, 25 years in the Air Force as a medic.  I

19   have a bachelor's degree in health care administration

20   from the University of Connecticut, and 30ish years in

21   health care, a first responder, an EMT, a firefighter,

22   and in law enforcement, and working in the correctional

23   environment as a Health Services Administrator.  It was

24   from the clinical environment in the military to the

25   administration when I got to Connecticut.

1    Q.    Thank you.  All right.  So you said in your

2    position you are involved with the medical treatment of

3    the detainees at Wyatt, correct?

4    A.    Yes.

5    Q.    Do you oversee the medical treatment?

6    A.    All of the health services that's provided.

7    Q.    And does that include Nia Moore-Bush?

8    A.    Yes.

9    Q.    And have you met personally with Nia Moore-Bush

10   with regard to her treatment while at Wyatt?

11   A.    Yes.

12   Q.    Approximately how many times have you met with

13   her?

14   A.    Oh, I interacted with Moore-Bush on several

15   occasions.  But face to face, I can't say how many

16   times.  It's a small facility, so I've seen her often.

17   Q.    Often over the 6 months that you've been working

18   there?

19   A.    Correct.

20   Q.    Have you also met with medical staff at Wyatt

21   about Ms. Moore-Bush's treatment?

22   A.    Yes.

23   Q.    Which members of the medical staff have you met

24   with regarding Ms. Moore-Bush?

25   A.    Um, nursing, nursing leadership.  We have two

```
 1   primarily providers.  The nurse practitioners are the
 2   primary providers for the female incarcerated persons,
 3   and that is a Holly Fernandes -- and that's "Fernandes"
 4   with an "S," and Dr. Edward Blanchett.
 5   Q.    Did you say there were two nurse practitioners?
 6   A.    There is.  There's the part-time nurse
 7   practitioner.  But I would say Holly Fernandez probably
 8   had seen Ms. Moore-Bush more than Sharon Garber had seen
 9   her.
10   Q.    So two nurse practitioners plus Dr. Edward
11   Blanchett?
12   A.    Correct.
13   Q.    And have you also reviewed Ms. Moore-Bush's
14   medical records?
15   A.    I've been through her records, yes.
16   Q.    Are you involved with referrals of Ms. Moore-Bush
17   to outside consultations for specific medical issues?
18   A.    No.
19   Q.    Has she been referred for outside consultations?
20   A.    Yes, many times.
21   Q.    And do recognize this is Ms. Moore-Bush sitting
22   here at counsel table?
23   A.    Yes.
24   Q.    Could you generally describe Ms. Moore-Bush's
25   health conditions and her diagnosis?
```

1    A.    I prefer not to go into the clinical aspects.   I

2    can tell you that she's hypertensive, she's diabetic --

3    a brittle diabetic.  She suffers from gastrointestinal

4    issues.  She had some dental issues.  She's got a number

5    of different multi system issues that I think would be

6    better addressed in this venue by the physician.

7    Q.    Well at this moment I'm just asking you generally

8    to describe her issues.

9    You said she's a "brittle diabetic."  What's that?

10   A.    Yes, not under very good control as diabetes go.

11   The patient is exhibiting objective signs that her

12   diabetes is not well under control.  Specifically her

13   hemoglobin A1C values should be in the neighborhood of

14   5.4 or 5.6 and they run 9.6 to 10.2.

15   Q.    You said 9.6 to 10.2 are the actual numbers?

16   A.    9.6 was the value as of January of this year.

17   Q.    Okay.  And is that A1C that you're describing?

18   A.    Correct.

19   Q.    And what's "A1C"?

20   A.    I'd rather not go into the exact definition, it's

21   a marker that we utilize when we're looking at the

22   fragility of a diabetic.  I think that those specific

23   values would be better explained by the physician.

24   Q.    Do you know what "A1C" is?

25   A.    I don't -- I don't think that for this particular

1  venue my education level is up to where it could be on

2  that.

3  Q.    What do you understand it to be?

4  A.    I understand it to be the endocrine value that

5  impacts the patient's overall system for, um -- no, I'm

6  going to stop there.  I'm going to say that, um, I did

7  not look at the exact definition before I came today.

8  Q.    Okay.  And I wasn't trying to trap you, I just was

9  asking for your understanding.

10  A.    As I said, it's better off that the clinician

11  answer that.

12  Q.    Okay.  But you do tell us about the levels, that

13  they should be at 5.4 to 5.6, and in fact they're at 9.6

14  to 10.2, is that right?

15  A.    Correct.

16  Q.    Were you involved with a request by Wyatt to the

17  U.S. Marshals for a transfer of Ms. Moore-Bush?

18  A.    I sent an e-mail to my boss, Warden Martin, um,

19  you know laying out some of the issues that were going

20  on with the care and the management of Ms. Moore-Bush,

21  and I believe that Warden Martin sent that e-mail --

22  forwarded my e-mail to the Marshal service.

23  Q.    Okay.

24      MR. HANYE:  Your Honor, may I approach?

25      THE COURT:  You may.

1   Q.   And do you recall that you provided those series

2   of e-mails to me yesterday in response to a subpoena?

3   A.   Yes.

4   Q.   And I'm handing up a document.  Do you recognize

5   what that document is?

6   A.   I do.

7   Q.   And is that the series of e-mails relating to

8   Wyatt's request for a transfer of Ms. Moore-Bush?

9   A.   (Silence.)

10  Q.   They're in reverse chronological order.  If you

11  look at the back of the last page, you may see the first

12  one.

13  A.   Yes, this is the e-mail that I sent to my boss

14  about Ms. Moore-Bush.  Yes.

15  Q.   So the last page of this document is the initial

16  e-mail that you sent to Warden Martin?

17  A.   Correct.

18  Q.   And then the rest of the e-mails, does that

19  include various exchanges with members of the Marshals

20  Department and also with Warden Martin?

21  A.   Yes.

22  Q.   Okay.  And then the first page, um, is that an

23  e-mail from you to Fabuela Carreira, um, who is involved

24  with medical review at the Marshal service?

25  A.   Yes.

1  Q.    Okay.

2        MR. HANYE:  Your Honor, I'd ask that this be

3  admitted as an exhibit.

4        THE COURT:  Well, we're going to take all the

5  e-mails, aren't we?

6        MR. HANYE:  Yes.

7        THE COURT:  All right.

8        No objection, Ms. Burkart?

9        MS. BURKART:  No objection, your Honor.

10       THE COURT:  It may be admitted as Exhibit 1 in

11  this proceeding.

12       (Exhibit 1, marked.)

13  Q.   I'm going to ask you some questions about your

14  initial e-mails, so the last page of the document.

15       THE COURT:  Have you got another copy for me while

16  he's --

17       MR. HANYE:  I do.  I'm going to go to probation's,

18  the copy that I gave to them.  If I may show this to the

19  Court?

20       (Hands up.)

21  Q.   So directing to you the last page of the document,

22  which is an e-mail that you sent to Warden Martin on

23  February 12th.

24  A.   Okay.

25  Q.   All right.  So in that e-mail, um, you said that

1    Ms. Moore-Bush was "at or near extreme levels."  Do you

2    see that?

3    A.    I do.

4    Q.    Okay.  What levels were you talking about?

5    A.    Her hemoglobin A1C.

6    Q.    What's the problem with a person who suffers from

7    extreme levels of hemoglobin and A1C?

8    A.    After my discussions with Dr. Blanchett, he

9    explained to me that elevated levels of hemoglobin A1C

10   for a period of time can have extreme detrimental impact

11   on a patient that could lead to issues such as

12   ketoacidosis, regional organ failure, and things like

13   that.

14   Q.    Okay.  And at the bottom of this e-mail, um, 1, 2,

15   3, 4, 5 lines up from the bottom, starting with "Ms. Nia

16   Moore-Bush is in danger of putting herself into

17   ketoacidosis and/or renal failure."

18   A.    Correct.

19   Q.    Okay.  And you note that "either or both are life-

20   threatening," is that correct?

21   A.    Yes.

22   Q.    And she is at further risk of cardiac, pulmonary,

23   endocrine, and other major organ issues?

24   A.    That's correct.

25   Q.    Okay.  So when you sent this e-mail on February

1    12th to Warden Martin, you were concerned that

2    Ms. Moore-Bush was suffering from life-threatening

3    conditions?

4    A.    When I sent this e-mail to my boss, to Warden

5    Martin, I was saying that she is, at some point in the

6    future, going to be putting herself in danger of these

7    things.

8    Q.    Okay.

9    A.    If she was in these conditions at the moment, she

10   would have been treated for same.

11   Q.    Okay.  So ketoacidosis, that is a potentially

12   life-threatening condition, is that right?

13   A.    Correct.

14   Q.    And what is it?

15   A.    "Ketoacidosis" is too much blood sugar.

16   Q.    Okay.  How would that manifest itself, meaning

17   would you know that a person is experiencing

18   ketoacidosis?

19   A.    So in my experience with ketoacidosis, you have an

20   altered level of consciousness to the point where an

21   individual could appear to be impaired, um, and they

22   often have a fruity breath, they're putting off ketos,

23   their body is trying to get rid of the sugar, and that

24   ketoacidosis, those are the signs and symptoms that you

25   would have with the altered mental state and the put-off

1   of ketones in the specific cell.

2   Q.    And is that condition so serious that it would

3   require treatment at an emergency room?

4   A.    That's correct.

5   Q.    So if Ms. Moore-Bush displayed those symptoms of

6   actively going into ketoacidosis, she would need to be

7   taken from Wyatt to an emergency room?

8   A.    Correct.

9   Q.    And what's the process for doing that?

10  A.    Well we call 911 and Center Falls Rescue arrives

11  and takes the patient to the emergency department, most

12  likely the Rhode Island Hospital in Providence.

13  Q.    And does staff from Wyatt have to go with her,

14  meaning the correctional officers?

15  A.    Um, yes.  I'm not intimate with the security

16  procedures, but in general, yes.

17  Q.    So for this e-mail, um, there was a request for

18  Ms. Moore-Bush to be transferred to a different

19  facility, is that right?

20  A.    Correct, it was the beginning of the process to

21  get from -- my attempt to get Ms. Moore-Bush to a

22  facility that had an infirmary, had a physician on staff

23  full-time, and had a higher level of care.

24  Q.    All right.  You mentioned that Wyatt has a

25  physician, Dr. Blanchett.  Is he not full-time?

1   A.    Dr. Blanchett is not full-time, Dr. Blanchett is a

2   contract part-time physician.  The nurse practitioners

3   are half-time.  So in total there's more than 1.0 FTE of

4   provider time, just not one single person.

5   Q.    Okay.  What hours does Dr. Blanchett work?

6   A.    Dr. Blanchett generally works three days a week,

7   um, 8 to 12 hours a day.

8   Q.    But you believe that it would be beneficial to

9   Ms. Moore-Bush to be in a facility with a physician

10  working full-time?

11  A.    I believe that -- yes, that Ms. Moore-Bush would

12  be better served at a facility that had an infirmary.  A

13  patient that's put into an infirmary in a correctional

14  setting.  This is -- this is not a correctional setting.

15  In a correctional setting, we have absolute control of

16  what a patient has access to while that patient is in an

17  infirmary.  So having an infirmary is critical for

18  somebody that's so noncompliant with their treatment

19  plan as Ms. Moore-Bush.

20  So if I had an infirmary, I could put her in an

21  infirmary and I could control what she had for foods and

22  I could better the intake and output, and then we could

23  do better tests and we could see what worked and what

24  didn't work for the patient.

25  Q.    And if Wyatt does not have an infirmary, what does

1   Wyatt have?  What's the difference between Wyatt's

2   facility and an infirmary?

3   A.    So Wyatt is more or less an outpatient clinic, um,

4   there are no infirmary beds, we don't have -- we cannot

5   provide IV care.  So just like a lot of jails around the

6   country, we do -- we have 24-hour coverage for health

7   services, always have a registered nurse on duty, always

8   have a physician, an administrator on call for

9   emergencies, and we are able to provide care on site.

10  Our higher echelon of care is the community hospitals.

11       THE COURT:  Have in mind I have a limited time

12  today and I'd like to accommodate this witness, and I

13  want to give Ms. Burkart a chance to inquire.

14       So have you got much more?

15       MR. HANYE:  I do have a little bit more, but I do

16  think we can finish with Mr. LaVonte today.

17       MR. HANYE:  By 11:00?

18       THE COURT:  By 11:00, yes.  So I'm seeing about 20

19  minutes?

20       THE COURT:  Well she gets some of that.

21       MR. HANYE:  She certainly does.

22       THE COURT:  Yes, I expect so.  All right.  Go

23  ahead.

24  Q.    Well let me ask you.  Your e-mail was out of a

25  concern that Mr. Moore-Bush could develop potential

1   life-threatening conditions, correct?

2   A.    Correct.

3   Q.    Is there a way to say how soon those might

4   develop?

5   A.    I would never -- I wouldn't go near there.

6   Q.    Was it enough of a concern that it could be soon

7   enough that you requested a higher level of care for

8   her?

9   A.    In my consultation with Dr. Blanchette, that's why

10  I initiated this message, was after speaking with

11  Dr. Blanchette about his concerns for the patient's

12  welfare.

13  Q.    Okay.

14  A.    Let me ask this question.

15  What prison, quasi-prison facilities are there, in your

16  experience, around that would provide a higher level of

17  care?

18        THE WITNESS:  So I come from the Connecticut

19  system, so in Connecticut we have detainees from

20  Connecticut, Rhode Island, and Massachusetts.  So in

21  Connecticut it would be the Janet York facility, Rhode

22  Island would be the ACI, and Massachusetts, um, the

23  facility that could take care of a patient like this

24  would be Framingham.  I'm not intimate with the

25  different jails.  Rhode Island and Connecticut have a

1    combined system where their jails and prisons are the

2    same facilities, where Massachusetts has county jails

3    and state prisons.  So I don't know what the capacity of

4    the county jails are for this kind of care.  I know

5    Framingham could do it.

6         THE COURT:  Well I'm familiar with the

7    organization of the Massachusetts system having lived

8    and practiced in Massachusetts, but I'm not familiar

9    with what level of care.

10         But from your familiarity, you think Framingham is

11    the type of prison that could provide her that care

12    because they have an infirmary?

13         THE WITNESS:  Yes, your Honor.

14         THE COURT:  All right.  And at least in the

15    Connecticut, Rhode Island complex, York is such a

16    facility, is that right?

17         THE WITNESS:  York for Connecticut and the ACI for

18    Rhode Island.

19         THE COURT:  And what is the "ACI"?

20         THE WITNESS:  Oh, the "Adult Correctional

21    Institution."

22         THE COURT:  Oh, okay.  Thank you.

23    Q.    Without going through all these e-mails,

24    Mr. LaVonte, what was the Marshal service's response to

25    Wyatt's request?

1      THE COURT:  Well I've read it.  It's now in
2 evidence.  I've read their response.
3 Q.   They said they're not planning to move Ms. Moore-
4 Bush, is that correct?
5 A.   Um, these e-mails led me to believe that they
6 weren't going to move the patient.
7 Q.   Do you have any reason to think that that's
8 changed, that there is a plan to move Ms. Moore-Bush?
9 A.   This is always a dynamic process.  In only my 6
10 months, there's been several times where I've tried to
11 move patients and it's -- I started this because I knew
12 it would be a process, so -- and from experience I
13 learned that you have to start early with the Marshal
14 service.  So that's what I did.
15 Q.   And did the marshals essentially say that they
16 believed that, um, the issues relating to Ms. Moore-
17 Bush's condition was an inmate management issue, not a
18 medical issue?
19      THE COURT:  Well they said that, they said --
20 Mr. Hanye, I've read the documents.
21 Q.   Do you -- as of Friday, February 28th, and that
22 was just the last e-mail on the first page of this
23 document, there was no plan to move Ms. Moore-Bush, is
24 that correct?
25 A.   That's correct.

1   Q.    And your response at that time included that "The
2   patient is deteriorating at a rate that shows higher
3   clinical need," is that -- I'm looking at the first
4   sentence of the e-mail on the front page of the
5   document.
6   A.    That's exactly what I said.
7   Q.    And is Ms. Moore-Bush still deteriorating at a
8   rate that requires higher clinical need?
9   A.    That is my opinion based on my conversations with
10  the providers.
11  Q.    Okay.  And your request for a transfer was made in
12  consultation with Dr. Blanchette?
13  A.    Correct.
14  Q.    Does Ms. Moore-Bush have conditions that are
15  related to her diabetes?
16  A.    Yes.
17  Q.    Is one of them a tunneling fistula?
18  A.    It could be.
19  Q.    Is that an infection?
20  A.    Yes.
21  Q.    Does her high levels of hemoglobin and A1C make
22  her more susceptible to infections?
23  A.    It makes it more difficult for the body to heal,
24  so, yes.
25  Q.    And a tunneling fistula is essentially an ongoing

1    infection in her stomach area?

2    A.    Yes.  For this patient.

3    Q.    For this patient.  Does she also have dental

4    infections?

5    A.    I don't know if she's infected right now, I know

6    she has -- she's explained to me that she has some

7    dental pain.

8    Q.    Has she been referred out to see a dentist?

9    A.    She saw an oral surgeon, she had surgery, um, I

10   don't -- she's in the process of -- well I don't want to

11   misspeak.  We're taking care of her needs as best we

12   can.  I don't know, with oral surgery, what the

13   situation is right now, so I don't want to speak to it.

14   Q.    Does she suffer from lupus?

15   A.    I don't know.  That was what I was trying to say.

16   Q.    Okay.

17   In one of the e-mails, including this additional one

18   from February 12th, you talk about Ms. Moore-Bush not

19   following a prescribed diet or exercise program, is that

20   right?

21   A.    That's correct.

22   Q.    What is her exercise program?

23   A.    I would have to -- I would have to defer to

24   Dr. Blanchette for the passive exercises that he

25   instructed her on during her patient education courses.

1    Q.    But Wyatt does not have any cardiovascular

2    machines like a stationary bike or treadmill or anything

3    like that, is that correct?

4    A.    No, but she lives in a large housing unit with

5    lots of open space to walk.  It's probably one of the

6    openest and easiest areas in the facility for an

7    individual to do some great walking -- and stairs.

8    Q.    When you say "open," you mean inside the unit or

9    actually outside?

10   A.    There is an area that's outside and there's also

11   an area inside that's very good for walking and there's

12   also a large set of stairs.

13   Q.    So is her exercise program walking then

14   essentially?

15   A.    Like I said, I would have to refer to the patient

16   education plan.

17   Q.    Your e-mail indicates that she's not compliant

18   with her diet.  Were you aware that Ms. Moore-Bush

19   recently completed a 120-day program and received a

20   certificate in cognitive behavioral therapy for weight

21   loss?

22   A.    Um, sure.

23   Q.    I have the certificate.  Were you aware that she

24   was in that program?

25   A.    Um, maybe peripherally.  Yes.

1    Q.    Okay.  Do you know anything about that program?

2    A.    Not too much.

3    Q.    Do you know the mental health director who runs

4    it?

5    A.    I do.

6    Q.    And do you know that there's a workbook that

7    requires participating for 140 days straight?

8    A.    Um, no, that I didn't know.

9    Q.    But you'll accept that there's a certificate that

10   shows that she completed that?

11   A.    Yes.

12   Q.    And wouldn't you agree that that's an investment

13   of time and effort in trying to treat her own condition

14   that's related to weight loss?

15   A.    I would say that it's an investment of time and

16   effort --

17         MS. BURKART:  Objection, your Honor.

18         THE COURT:  The objection is sustained on this

19   foundation.

20   Q.    What is --

21         THE COURT:  Really, Mr. Hanye, Ms. Burkart gets a

22   a chance here.  How much more do you have?

23         MR. HANYE:  I'm trying to hit the high point, your

24   Honor.  May I submit the certificate?

25         MS. BURKART:  No objection.

1      THE COURT:  You have an objection to it.

2  Overruled.  We'll accept it.

3      MS. BURKART:  I said no objection, your Honor.

4      THE COURT:  Oh, no objection.  Exhibit 2.  And

5  thank you.

6      (Exhibit 2, marked.)

7      THE COURT:  Anything else?

8      MR. HANYE:  Yes, your Honor.

9      (Pause.)

10  Q.    In February, um, of this year, was Ms. Moore-Bush

11  held, um, in the HSU, the Health Services Unit, for a

12  period of time?

13  A.    Yes.

14  Q.    Was that about a week?

15  A.    I don't know exactly how long, but I saw her a few

16  times.  I think I saw her over a weekend, so it could

17  have been at least four days.  I don't know if it was a

18  full week.

19  Q.    Why was she held in the Health Services Unit?

20  A.    That was an order from a physician, um,

21  Dr. Blanchette.  I don't know exactly the clinical

22  reason.

23  Q.    Do you know there was an order that she not

24  receive any outside food during the time that she was at

25  the HSU?

1    A.    Absolutely.

2    Q.    Do you recall that there was a note that was

3    placed on the cell door in the HSU that there's no food

4    except for what's approved by Dr. Blanchette?

5    A.    Correct.

6    Q.    All right.  Did her levels of hemoglobin or A1C go

7    down during the time she was in the Health Services

8    Unit?

9    A.    I don't know.  I don't know if we do labs right

10   after that.  She was held in the Health Services Unit

11   after a MRI where her optic nerve, um -- that an

12   optometrist was concerned, if I remember correctly, that

13   there was some crystallization around the optic nerve,

14   and Dr. Blanchette wanted the results --

15        MS. BURKART:  Objection, your Honor.  They would

16   suggest that, um --

17        THE COURT:  Yeah, the objection is sustained, what

18   the doctor wanted.

19        MR. HANYE:  May I approach, your Honor?

20   Q.    I show you another document, Mr. LaVonte.

21   Do you recognize that, um, from Mr. Moore-Bush's medical

22   record, describing that she was to be held in the Health

23   Services Unit beginning on February 13th?

24   A.    No, sir, I'm not familiar with this document.

25   Q.    Um -- fair enough.  Was Ms. Moore-Bush referred to

1    an outside endocrinologist?

2    A.    Yes.

3    Q.    If I showed you the documents from that referral,

4    would you be able to recognize them?

5    A.    I may.

6          THE COURT:  Look, Mr. Hanye --

7          MR. HANYE:  This is the last question, your Honor.

8          THE COURT:  All right.  All right.  Go ahead.

9    Q.    Do you recognize that document?

10   A.    I can't say that I've seen this one.

11   Q.    Do you know who Roger Cerani is?

12   A.    I do not.

13   Q.    Okay, I'll take that back.

14   Is it still your opinion, um, based on consultations

15   with Dr. Blanchette and other medical experts, that at

16   this time Ms. Moore-Bush is still at risk of potentially

17   life-threatening conditions?

18   A.    Yes.

19   Q.    And because of that she should be transferred to a

20   higher-level --

21   A.    That's our opinion.

22   Q.    But the marshals have said no?

23   A.    At this point they've said no.

24   Q.    Thank you.

25         THE COURT:  All right.  Ms. Burkart, I speak only

1   to be of assistance really, not that I'm assisting one

2   side or the other.

3       I get from these documents that she is not

4   compliant with her dietary or medical needs, so I don't

5   know as we need to spend much time on that.

6       MS. BURKART:  Thank you, your Honor.

7       THE COURT:  When we resume, if we resume, I -- not

8   today, but I will be asking you, as I asked the witness,

9   um, where she could get a level of care in a more

10  restrictive setting that would deal with her medical

11  needs.  Now I've said enough.  You go ahead.

12      MS. BURKART:  Thank you, your Honor.

13

14  CROSS-EXAMINATION BY MS. BURKART:

15  Q.   I just want to follow up on that last question

16  that Mr. Hanye asked you, and I apologize, um, while

17  listening to his Honor, I forgot what the question was.

18  Do you recall what it was?

19  A.   I was asked about, um, at this point where were we

20  transferring --

21      THE COURT:  The last two questions were was she

22  deteriorating, and as of now the marshals won't move

23  her?

24      MS. BURKART:  Thank you.

25  Q.   And you had mentioned earlier, when Mr. Hanye was

1    asking you about your conversations with the marshals,

2    that it was your sense that this is a process with the

3    Marshals service in terms of making a prisoner move.

4    Could you explain what you meant by that, that it was a

5    process?

6    A.    Well in my short tenure I've learned that we must

7    communicate to the Marshal service when someone -- in

8    cycle care -- not in emergencies, but in cycle care we

9    need to let the marshals know what's going on, explain

10   to them what's happening, tell them where this patient

11   would be better served, and then allow that process for

12   them to find someplace for that patient to go.

13   Q.    So effectively begin a dialogue with the marshals?

14   A.    Correct.

15   Q.    You've indicated that was different than like in

16   an emergency situation.  Do you do something different

17   in an emergency situation?

18   A.    Yes.  So depending on the type of emergency, um,

19   we get the patient to definitive care, and then we make

20   quicker arrangements with the marshals, when the patient

21   is going to be discharged, where they're going to go.

22   Q.    So in your opinion, when you wrote this e-mail on

23   February 12th, was Ms. Moore-Bush's situation in an

24   emergency?

25   A.    No.

1    Q.    You were beginning a dialogue?

2    A.    Correct.

3    Q.    Do you understand that dialogue to be completed at

4    this point or is that process ongoing?

5    A.    No.

6    Q.    You said "no," is that right?

7    A.    That this is a process.  No.

8    Q.    Okay.  So as part of the process you raised

9    concerns, like you did in the e-mail on February 12th,

10   is that right?

11   A.    Correct.

12   Q.    And then as part of that you engaged in this type

13   of conversations with your superiors, with the doctors,

14   and with the marshals service that you've been engaging

15   in, is that right?

16   A.    That's correct.

17   Q.    Is it your understanding that you're done with

18   that now or is there still open questions as to whether,

19   for instance, Framingham or the Connecticut facility

20   would be an appropriate facility for Ms. Moore-Bush?

21   A.    Well his Honor asked, in my opinion, in my

22   experience what's appropriate.  So that's the type of

23   facility.

24   Q.    Right.  To be fair you're looking at it in terms

25   of -- from an administration perspective, where did the

1  facilities exist, is that right?

2  A.    Correct.

3  Q.    And you're not privy to, for instance, discussions

4  between the U.S. Marshal services and what contracts

5  they have in place, is that right?

6  A.    I wouldn't have any idea about that, correct.

7  Q.    And is it your understanding that that's part of

8  the process that you raised concern about as an

9  administrator and that that's your perspective, correct?

10 A.    I wouldn't be able to speak to their process.

11 Q.    In other words, you're speaking to just what you

12 know, which is that you see facilities have different

13 levels of care and you're raising questions about

14 whether Ms. Moore-Bush should be moved to one of these

15 facilities.  But others look at it from a different

16 perspective, is that accurate?

17 A.    Of course.  Of course.

18 Q.    Okay.  You're not a doctor, are you?

19 A.    No, I'm not.

20 Q.    Okay.  So you wrote this e-mail to Mr. Daniel

21 Martin, and who is that?

22 A.    That's the Warden of the Wyatt detention facility.

23 Q.    And you cc'd Ms. Robin Fox.  Who is that?

24 A.    That's the director of the nurses facility.

25 Q.    Okay.  And that begins the process of the Marshals

1   service from your perspective, correct?

2   A.    Well the Warden is the facility administrator and

3   he directs the correspondence and the communication with

4   the Marshals service.

5   Q.    Okay, so that begins the discussion.

6   At the end you said:  "This patient is no longer

7   appropriate for this facility, she requires a facility

8   with a full-time onset position with infirmary-level

9   care."

10  You were not suggesting that she should be released to

11  the community, were you?

12  A.    No.

13  Q.    Do you think that would be appropriate for her?

14        MR. HANYE:  Objection.

15  A.    Well I don't know anything about that.

16        MR. HANYE:  Objection.

17        THE COURT:  Well you've objected and his answer

18  was "I don't know anything about that."  Would you

19  accept that?

20        MR. HANYE:  Yes, your Honor.  Thank you.

21        THE COURT:  All right.

22  Q.    You said she had opportunities to exercise at

23  Wyatt, is that right?

24  A.    Correct.

25  Q.    Do you feel these other facilities also have

1    opportunities to exercise for patients?

2    A.    All the facilities I've been to, yes.

3    Q.    Do you have healthy food options at Wyatt?

4    A.    I'm not an expert of what the food service is.  I

5    do see fruit and vegetables going out.  I'm -- but I

6    don't know the full menu.

7    Q.    Providing appropriate food for a diabetic is part

8    of the care of a diabetic patient?

9    A.    Yes, and there's a specific diabetic diet that can

10   be ordered.  There's also a Kosher diet depending on the

11   -- yes, there's several different diets that --

12   Q.    -- are perfectly good for medical needs?

13   A.    Yes.

14   Q.    And that's available at Wyatt?

15   A.    Correct.

16   Q.    Okay.  Do you have any other diabetic patients at

17   Wyatt or have you ever treated diabetic patients at

18   Wyatt?

19   A.    Yes.  Yes and yes.

20   Q.    Is it a serious condition in your view?

21   A.    It can be.

22   Q.    Is it a condition that is somewhat common?

23   A.    Yes.

24   Q.    How often would you say you see diabetic patients?

25   Frequently?

1  A.    I would say out of the 700 detainees we have right

2  now, we usually carry about 25 insulin-dependent

3  diabetics, and probably 40 total.  So the other 15 would

4  be noninsulin-dependent diabetics.

5  Q.    Okay.  So there's significant numbers of diabetic

6  patients at Wyatt?

7  A.    Correct.

8  Q.    Are there significant numbers of diabetic patients

9  at other medical facilities that you're aware of?

10  A.    At every facility that I've worked at.

11  Q.    Is it fair to say it's a very common condition?

12  A.    Yes.

13  Q.    Does it require self-care?

14  A.    Yes.

15  Q.    You say "yes" rather emphatically, why is that?

16  A.    Diabetes is probably one of the diseases that

17  requires the patient to be the most compliant and the

18  most vigilant.  Diabetes is controlled almost

19  exclusively by the patient and what they consume.

20  Q.    You mentioned that, um, Ms. Moore-Bush was, you

21  said, "In danger of putting herself into ketoacidosis

22  and/or renal failure."  What did you mean by "In danger

23  of putting herself into those conditions"?

24  A.    Um, based on the information we had, Ms. Moore-

25  Bush consumed an extreme amount of commissary items that

1    are not appropriate for a diabetic patient to eat.

2    Q.    You said in your e-mail that she claims that all

3    she ate was salad and tuna.  Did she claim that to you

4    or was it to her doctor?

5    A.    She claimed that to me in the kiosk system that --

6    where the inmates -- where the detainees went back and

7    forth with us.

8    Q.    So she told you that directly?

9    A.    That's correct.

10   Q.    And in fact did you check the commissary

11   purchases?

12   A.    I did, I went through 6 months of commissary

13   purchases and found things other than fish, eggs, and

14   salad.

15   Q.    You termed the purchases "grossly inappropriate

16   for a diabetic to eat."  What did you mean by that?

17   A.    Some of the items were potato chips, Cheez-Its,

18   cheese spread, things that are super high in

19   carbohydrates, super high in fat.

20   Q.    You said that Ms. Moore was displaying "stock

21   splitting and answer shopping," what did you mean by

22   that?

23   A.    So Ms. Moore-Bush is a very intelligent and

24   articulate individual and she's been at the facility for

25   14 months, and that's a long time to be in a jail, and

1   at the Wyatt facility we have only 13 units, and of

2   those units only one is dedicated to females.  So these

3   individuals -- these women are in one unit with each

4   other 24 hours a day, eating three meals, sleeping in

5   the same area.  So they -- the interaction and what

6   happens when somebody is, you know, in one static

7   environment can get to be somewhat -- there could be

8   some interpersonal friction.

9   Q.    So when you said Ms. Moore-Bush is "manipulative

10  and tries to spin up other patients," is that the type

11  of, I think you said, "manipulative and maladaptive

12  behavior" that became intertwined with her health,

13  became detrimental to the health and well-being of the

14  patient?

15  A.    That's correct.

16  Q.    Is it detrimental to her own health and well-

17  being?

18  A.    Yes.

19  Q.    Okay.  So are you suggesting, in essence, that her

20  medical situation is very tightly, um, connected with

21  her own behavior?

22  A.    Correctional health care is holistic, it involves

23  not only the care and what's going on with a person, but

24  also their environment, how they're treated, how they

25  act.  It's a city -- it's a small city and village,

1    everything is there, so everything is intertwined in a
2    correctional facility.  So what happens in the unit,
3    what happens with mental health, what happens
4    interpersonally, it impacts a patient's care.
5    Q.    So as you raised concerns about her physical
6    health, you were considering some of her own self-
7    sabotaging behavior?
8    A.    I looked at the whole picture.
9    Q.    Okay.  You mentioned the Janet York facility in
10   Connecticut and the Framingham facility to be higher
11   levels of care.  In what way do you see facilities like
12   that to be better suited to meet Ms. Moore-Bush's needs?
13   A.    Well in several different ways.  I mentioned that
14   Wyatt only has one unit that houses the female patients,
15   the York facility and the Framingham facility have
16   numerous units.  So a patient could be moved from unit
17   to unit to get a different environment.  As those of us
18   who have been in the military well know, if you spend
19   enough time with one person all the time, things are
20   going to get a little rough.  So what we want to do is
21   we want to take those people and we want to move them
22   around.  Change can be good when it comes to a
23   correctional environment.  So the York facility has
24   about 1,000 patients and the Framingham facility, last I
25   looked, had about 1200 patients.

1    Q.    So --

2          THE COURT:  All right, that's enough for today.

3    You may step down, sir.

4          MS. BURKART:  May I ask one final question, your

5    Honor?

6          THE COURT:  You may.

7    Q.    What I heard you saying in that last point was

8    that part of your suggestion to begin a process with the

9    Marshals office was a way to consider whether moving

10   Ms. Moore-Bush to just a different facility might in

11   fact aid her medical condition because it would

12   help contribute to her getting essentially some fresh

13   faces and some new staff, would that be fair?

14   A.    Yes.

15   Q.    Okay.

16         MS. BURKART:  Thank you, your Honor.

17         MR. HANYE:  Your Honor, may I have five questions?

18         THE COURT:  Not now.  I'm not saying you can't

19   recall him -- and this may warrant a more thorough

20   examination, but we're stopping now.  I told you that

21   and you said you'd be done.  You're not done.  So what I

22   want to be advised on is when we will resume.

23         And I have a question for you, Ms. Burkart, and

24   I'll preface it like this.

25         I've been around long enough that people who I

1  have sentenced to prison have died there.  That's an

2  aspect of the responsibility of this job.  I've never

3  had a pretrial detainee be in such an extreme position.

4  I don't ever intend to.  So when we resume, I want your

5  proposal for a higher level of care for Ms. Moore-Bush.

6       When shall we resume?  Tomorrow?  Thursday?  Or at

7  some later date.  And we'll start with the government.

8       MS. BURKART:  Your Honor, I have a full-day

9  commitment tomorrow.  I would like additional time for,

10  um, the Marshal service to be able to make a --

11       THE COURT:  How much time?

12       MS. BURKART:  I would ask that we resume next

13  week, your Honor.

14       THE COURT:  Okay, Mr. Hanye?  I will pick a

15  specific time.

16       MS. BURKART:  Yes, your Honor.

17       THE COURT:  That's okay, isn't it?

18       MR. HANYE:  Yes, your Honor.

19       THE COURT:  All right, let me consult with the

20  Clerk.

21       (Pause.)

22       THE COURT:  Tuesday morning at 9:30?

23       MR. HANYE:  It would be much better for me, your

24  Honor, if available to the Court, we can do it Thursday

25  or Friday, um, given my other obligations.

1          THE COURT:  Thursday at 9:30.

2          Ms. Burkart?

3          MS. BURKART:  That works for the government, your

4    Honor.

5          THE COURT:  Very well.

6          MR. HANYE:  Your Honor, I understand respectfully

7    now that I have very few questions for Mr. LaVonte and

8    I'm hoping not to have to bring him back?

9          THE COURT:  No, we're stopping now.  I told you

10   that.  You said you would be done.  You're not done.

11         All right.  I don't know that it's necessary to

12   bring him back, but that's a decision you must make.  I

13   thank him for his testimony and I thank him for his care

14   of Ms. Moore-Bush.

15         I need a brief recess and we'll take that recess

16   now.  We'll recess.

17         THE CLERK:  All rise.

18         (Adjourns, 11:00 a.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

do hereby certify that the foregoing record is a true

and accurate transcription of my stenographic notes,

before Judge William G. Young, on Tuesday, March 3,

2020, to the best of my skill and ability.



/s/ Richard H. Romanow 04-15-20
_____
RICHARD H. ROMANOW  Date